

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-20-2006

# USA v. Banks

Precedential or Non-Precedential: Precedential

Docket No. 05-1715

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"USA v. Banks" (2006). *2006 Decisions*. Paper 790.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/790

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 05-1715

———

UNITED STATES OF AMERICA

v.

VAMPIRE NATION
a/k/a
FREDRIK VON HAMILTON
a/k/a
FREDERICK HAMILTON BANKS

Frederick H. Banks,

<u>Appellant</u>

———

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Criminal No. 03-cr-00245)
District Judge: Honorable Thomas M. Hardiman

———

Argued: May 16, 2006

Before: RENDELL, VAN ANTWERPEN, and WEIS,
<u>Circuit</u> <u>Judges.</u>

(Filed June 20, 2006)

David B. Chontos (Argued)
Chontos & Chontos, P.C.
561 Beulah Road

Turtle Creek, PA 15145
          *Counsel for Appellant*

Mary Beth Buchanan
Laura Schleich Irwin (Argued)
Office of the United States Attorney
United States Post Office and Courthouse
7th Avenue & Grant Street
Pittsburgh, PA 15219
          *Counsel for the United States*

————

OPINION OF THE COURT

————

VAN ANTWERPEN, <u>Circuit</u> <u>Judge.</u>

On October 14, 2004, a jury in the Western District of Pennsylvania convicted Frederick Banks on charges of mail fraud, criminal copyright infringement, uttering and possessing counterfeit or forged securities, and witness tampering. These convictions stemmed from Banks's sales of illegally copied ("pirated") versions of copyrighted Microsoft software products through an Internet marketplace website, Amazon.com. Following his conviction, the District Court, on February 25, 2005, imposed on Banks a sentence that varied upward by three months from the advisory sentence range set forth in the United States Sentencing Guidelines ("Guidelines"), and, on the Government's motion, also issued an *in personam* forfeiture judgment in the amount of Banks's mail fraud proceeds.

Before us now is Banks's appeal from his conviction and sentence, in which he asserts numerous claims of error based on the District Court's actions before his trial, on events occurring at his trial, and on the District Court's actions at his sentencing. Banks was sentenced after the Supreme Court announced its landmark decision in <u>United States v. Booker</u>, 543 U.S. 220 (2005).

Of the seven issues Banks raises on appeal, two are novel to

this Court. First, Banks raises the question whether the District Court was obligated to provide him with advance notice under Federal Rule of Criminal Procedure 32(h) of its intent, under Booker, to vary its sentence from the advisory sentence range set forth in the Guidelines. Second, Banks questions whether the District Court had statutory authority to order an *in personam* forfeiture judgment against him for the amount of the proceeds he obtained through his mail fraud.

As we explain below, we find no error in the District Court's actions before, during, or after Banks's trial or at his sentencing. Furthermore, we conclude the District Court had statutory authority to issue the *in personam* forfeiture judgment and was not obligated to provide advance notice of its intent to vary from Banks's Guidelines sentencing range. Accordingly, we will affirm Banks's convictions and sentence in their entirety.

I.

In setting forth the facts of this case, we construe them in the light most favorable to the Government, as we must following the jury's guilty verdict. Glasser v. United States, 315 U.S. 60, 80 (1942). According to the evidence adduced at trial, in 2002 Banks opened a seller's account on Amazon.com, an on-line marketplace, using the names Rick Burgess and John Cain. When Banks opened these accounts, Amazon.com informed him that only full retail versions of software products could be sold through his account and that sales of copied or duplicated software were prohibited.

Banks then posted for sale on his account various Microsoft products, for which products he set prices and posted additional information concerning the products' condition. Through his seller's account, Banks sold copies of Microsoft products to a variety of buyers from 2002 into 2003. These buyers suspected that the software they purchased from Banks was illegally copied because the compact discs ("CDs") they received from Banks contained generic white CDs with fake labels and fake package inserts.

By 2003, Amazon.com had received several complaints

3

about Banks's activities. In January, 2003, Amazon.com informed Banks it was blocking his account because of reports of buyers receiving "recopied" Microsoft software.

Banks then opened a new seller's account on Amazon.com under the name Mark Howard. Using this new account, Banks posted additional advertisements offering various Microsoft products for sale. One buyer, Action Software, Inc., purchased a total of $294,859.00 of Microsoft products from Banks. Action Software expected to receive 50 boxes of product, but only 5 boxes of product arrived via United Parcel Service ("UPS"), which boxes contained CDs with the IBM name on them. After opening one of these boxes, Action Software's representative, Samantha Belfer, concluded the company had been defrauded. However, because Banks had sent the CDs cash-on-delivery, Belfer had already given UPS a check for $49,000.00 made out to Banks in exchange for the CDs.

After Banks denied knowledge of the IBM CDs, Belfer contacted the Federal Bureau of Investigation ("FBI"), which initiated an investigation. FBI agents went to Banks's residence, whereupon Banks informed them he had no knowledge of why Action Software did not receive its Microsoft products.

In May, 2003, the FBI obtained a search warrant for Banks's residence. A search of the residence revealed computers, blank CDs, a CD duplicating machine, and empty boxes from Microsoft and IBM software. The FBI also searched the contents of Banks's computers, which contents included images of the front and back sides of Microsoft software boxes.

Meanwhile, Banks continued to sell alleged Microsoft software and approached VioSoftware, a Colorado-based reseller of software from which Banks had purchased a Microsoft product in 2002. Banks convinced Warren Do, the chief executive officer of VioSoftware, to sell him $58,661 of Microsoft software. Banks told Do he needed the products immediately, and Do agreed to accept cash on delivery in lieu of advance payment.

VioSoftware then sent Banks a partial shipment via Federal

Express on August 28, 2003, and Banks presented Federal Express with a check for $58,661 and made payable to VioSoftware, which check was actually fake. When Do received the fake check, he contacted Banks to tell him that he wanted VioSoftware's products returned and that he knew the check was a fake and had spoken to the FBI. On September 3, 2003, Banks responded that he would return the products if Do would return the fake check to him. Do agreed to return Banks's fake check upon receipt of VioSoftware's products.

On that same date, Do received a subpoena from a grand jury in the Western District of Pennsylvania. The next day, Do received only a partial shipment from Banks. Do then emailed Banks to inform him that he had been subpoenaed, that he had spoken with the FBI, and again requested the return of VioSoftware's products. On September 17, Do emailed Banks:

> "I spoke to them on Monday again and told them the truth. I told them I was trying to work it out with you and if you paid me back for everything you owe I would send the check back to you. I'm supposed to call them in a few days to give them a status."

S. App. 55. Banks responded:

> "Please don't give them any information they can still supeana [sic] you if you do! and this would all be for nothing. it's up to you of course but I would prefer that. let's consider that we owe you and are working off a credit."

S. App. 55. Banks eventually sent Do a package, but the package contained only damaged materials. In the meantime, Banks sold to other buyers some of the software he had obtained from VioSoftware.

Based on information that Do supplied, the FBI searched Banks's residence a second time on September 29, 2003. That search uncovered additional evidence of software piracy, including computers and Microsoft software products and packages.

5

On October 7, 2003, a grand jury returned a five-count indictment against Banks. A superseding indictment issued on May 4, 2004, adding counts of uttering and possessing counterfeit or forged securities, and on August 10, 2004, a grand jury returned a second superseding indictment charging Banks with three counts of mail fraud, 18 U.S.C. § 1341 (Counts One, Two, and Three); one count of copyright infringement, 17 U.S.C. § 506(a)(1) and 18 U.S.C. § 2319(b)(1) (Count Four); one count of money laundering, 18 U.S.C. § 1957 (Count Five); one count of uttering and possessing counterfeit and forged securities, 18 U.S.C. § 513(a) (Count Six); and one count of witness tampering, 18 U.S.C. § 1512(b)(2)(A) (Count Seven). The second superseding indictment also contained forfeiture allegations relating to, *inter alia*, Banks's alleged mail fraud.

The case then proceeded to trial, and after ten days of testimony, on October 14, 2004, the jury found Banks guilty on all seven counts. At the close of trial, Banks moved for acquittal, which motion the District Court denied. Before sentencing, the Government filed a motion for an *in personam* money judgment against Banks, alleging Banks had "acquired the sum of $70,708.59 from his violation of 18 U.S.C. § 1341." App. 1442-43.

At sentencing on February 25, 2005, the District Court heard oral argument on the *in personam* forfeiture judgment issue, at which Banks's counsel claimed the District Court lacked statutory authority to impose such a judgment. The District Court observed that there was no controlling case law on the question whether the Government was entitled to an *in personam* money judgment without specific reference to any forfeitable property.

Following argument, the District Court sentenced Banks. Banks's advisory Guidelines sentence range was 46-57 months, but the District Court, after considering this advisory range, the grounds raised by the parties and the factors set forth in 18 U.S.C. § 3553(a), sentenced Banks to 60 months imprisonment and three years' supervised release. App. 2. The District Court also ordered an *in personam* forfeiture judgment against Banks for $70,708.59, the amount of Banks's mail fraud proceeds. App. 1444. This

timely appeal followed.

## II.

We have jurisdiction over the District Court's Order of judgment and conviction pursuant to 28 U.S.C. § 1291. We have jurisdiction to review Banks's sentence pursuant to 28 U.S.C. § 3742(a). United States v. Cooper, 437 F.3d 324, 327 (3d Cir. 2006).

## III.

### A.

We first address whether, after United States v. Booker, 543 U.S. 220 (2005), Rule 32(h) required the District Court to provide advance notice of its intent to impose a sentence that varied from the advisory Guidelines range. Although Banks's advisory Guidelines sentencing range was 46-57 months, the District Court imposed a sentence of 60 months. The District Court did not, however, make a formal departure from the Guidelines sentencing range.

In his brief, Banks contended that the District Court erred by varying its sentence upward and failing to provide advance notice of its intention to do so. Banks alleged this failure to provide advance notice was a violation of Fed.R.Crim.P. 32(h).[1] Banks Br. at 39. In its brief, the Government correctly observed that Banks did not object to his sentence and took the position that Banks could not establish plain error because he failed to state what, if

---

[1]Rule 32(h) states,

"Before the court may depart from the applicable sentencing range on a ground not identified for departure either in the presentence report or in a party's prehearing submission, the court must give the parties reasonable notice that it is contemplating such a departure. The notice must specify any ground on which the court is contemplating a departure."

7

anything, he would have done differently at sentencing had he had advance notice of the District Court's intent to vary from the advisory Guidelines sentence. Gov't Br. at 45.

The parties, however, took somewhat different positions at oral argument. Banks's counsel conceded at that time that the District Court's sentence in this case was a "variance" based on an exercise of its discretion under Booker and the factors set forth in 18 U.S.C. § 3553(a), and conceded that because the District Court had engaged in a variance and not a departure under the Guidelines,[2] Rule 32(h) was not triggered and advance notice of the variance was unnecessary. The Government took the position that district courts should provide advance notice of their intent to vary from a Guidelines sentencing range, regardless of whether that variance is upward or downward. Our review of Booker's effect on Rule 32 and evolving sentencing jurisprudence leads us to conclude the District Court was not obligated to provide Banks with advance notice of the 3-month upward variance in his sentence, where that variance was based on application of the § 3553(a) factors under Booker and not on a departure from the Guidelines.

Rule 32(h) was a response to the Supreme Court's decision in Burns v. United States, 501 U.S. 129 (1991), where the Court held that an earlier version of Rule 32 required district courts to give defendants advance notice before engaging in *sua sponte* upward departures from Guidelines sentences. Id. at 136; United States v. Walker, 447 F.3d 999, 1006 (7th Cir. 2006). Rule 32(h) was adopted at a time when courts could only avoid a Guidelines range by departing from the Guidelines. However, the Supreme Court made clear in Booker that the Guidelines are now advisory. Thus, district courts, post-Booker, exercise broad discretion in imposing sentences, so long as they begin with a properly

---

[2]For lexicographic purposes, we adopt the Eighth Circuit's terminology from United States v. Sitting Bear, 436 F.3d 929 (8th Cir. 2006), where that court described post-Booker discretionary sentences not based on a specific Guidelines departure provision as "variances." Id. at 932-33.

calculated Guidelines range, fully consider the broad range of factors set forth in 18 U.S.C. § 3553(a),[3] and all grounds properly advanced by the parties at sentencing. See Cooper, 437 F.3d at 329-30. Thus, district courts continue to consider all grounds properly advanced by the parties at sentencing, as they did in the past, and they continue to consider the Guidelines range, which is now advisory. What has changed post-Booker, is that sentencing is a discretionary exercise, and now includes a review of the factors set forth in § 3553(a). These factors are known prior to sentencing. Because defendants are aware that district courts will consider the factors set forth in § 3553(a), we believe the element of "unfair surprise" that Burns sought to eliminate is not present. See Walker, 447 F.3d at 1007 (observing that "defendants are on notice post-Booker that sentencing courts have discretion to consider any of the factors specified in § 3553(a)"); cf. United States v. Vaughn,

---

[3] Under 18 U.S.C. § 3553(a), the relevant factors to be considered at sentencing are:

"(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed-
  (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
  (B) to afford adequate deterrence to criminal conduct;
  (C) to protect the public from further crimes of the defendant; and
  (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines. . . ."

9

430 F.3d 518, 524 (2d Cir. 2005) (concluding application of Booker to cases on direct review was not ex post facto violation, observing that "[j]ust as appellants had fair warning that their conduct was criminal, they also had fair warning of the potential penalties they faced. . ."). Thus, in the words of the Seventh Circuit, "[n]ow that Booker has rendered the Guidelines advisory, the concerns that animated the Court's decision in Burns no longer apply." Walker, 447 F.3d at 1006. Accordingly, given that defendants are aware that courts will consider the broad range of factors set forth in § 3553(a) at sentencing, we perceive none of the "unfair surprise" considerations that motivated the enactment of Rule 32(h).

Furthermore, the requirement of Rule 32(h) that the court specify "any ground" of contemplated departure from the Guidelines range was designed for pre-Booker departures, which were constrained by the provisions of the Guidelines pertaining to departures. See Guidelines Chapter 5, Part K. The Guidelines have now become advisory and they no longer limit the grounds a court can consider at sentencing. Thus, the Guidelines are now only one factor among many which can influence a discretionary sentence. Application of the advance notice requirement of Rule 32(h) to discretionary sentence would elevate the advisory sentencing range to a position of importance that it no longer can enjoy. See Cooper, 437 F.3d at 331 (rejecting argument that a within-Guidelines sentence was necessarily reasonable and observing that holding otherwise "would come close to restoring the mandatory nature of the guidelines excised in Booker") (citing United States v. Crosby, 397 F.3d 103, 115 (2d Cir. 2005)).

Booker contemplates that the district court will impose a discretionary sentence *after* consideration of the advisory Guidelines, the grounds raised by counsel, the defendant's allocution, victim statements,[4] other evidence, and the factors set

_____

[4]The right of victims to be heard is guaranteed by the Crime Victims' Rights Act ("CVRA"), Pub. L. No. 108-405, §§ 101-104 (2004) (codified at 18 U.S.C. § 3771). The right is in the nature of an independent right of allocution at sentencing. See 18 U.S.C. §

forth in § 3553(a).  Cooper, 437 F.3d at 332.  Booker does not contemplate that the court will somehow arrive at its sentence prior to sentencing, and requiring advance notice of "any ground" beyond the factors set forth in § 3553(a) would undoubtedly prove to be unworkable.

The First, Seventh, Eighth, and Eleventh Circuits have all concluded that, post-Booker, a sentencing court need not provide advance notice of a variance – based on a review of the case's history and considerations of the § 3553(a) factors – from an advisory Guidelines sentence.[5]  United States v. Mateo, 2006 WL 1195676, at *1 (1st Cir. May 5, 2006) (unpublished) (district court's failure to provide advance notice of variance not plain error); Walker, 447 F.3d at 1006-07; United States v. Egenberger, 424 F.3d 803, 805 (8th Cir.), cert. denied, 126 S. Ct. 1106 (2006)

3771(a)(4) (affording victims a "right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding").  Under the CVRA, courts may not limit victims to a written statement.  See Kenna v. United States District Court, 435 F.3d 1011, 1017 (9th Cir. 2006) (Kozinski, J.) ("Limiting victims to written impact statements, while allowing the prosecutor and the defendant the opportunity to address the court, would treat victims as secondary participants in the sentencing process.  The CVRA clearly meant to make victims full participants.").  Given that it would be impossible to predict what statements victims might offer at sentencing, it would be unworkable to require district courts to provide advance notice of their intent to vary their discretionary sentence based on victim statements that had not yet been made.

[5]We recognize that two other circuits have held to the contrary.  United States v. Davenport, 445 F.3d 366, 371 (4th Cir. 2006); United States v. Dozier, 444 F.3d 1215, 1216-17 (10th Cir. 2006).  While according due respect to the decisions of our sister Circuits, we reiterate that our conclusion is consonant with the fact that post-Booker, defendants are on full notice that a sentencing court will consider the § 3553(a) factors and in doing so, may exercise its discretion to vary from a Guidelines sentence in a way that is not based on a specific Guidelines departure provision.

11

(notice under Rule 32(h) not required where "the court properly calculated the advisory Guidelines range, and only then, after considering all of the additional § 3553(a) factors as required by Booker, did the district court enter a sentence that was above the advisory Guidelines range); United States v. Simmerer, 156 Fed. Appx. 124, 127-28 (11th Cir. 2005) (post-Booker, failure to give prior notice under Rule 32(h) of a contemplated upward "variance" from the Guidelines sentencing range not plain error). We join these courts of appeals and conclude Banks was not entitled to advance notice under Rule 32(h) of the District Court's intent to vary its sentence from the advisory Guidelines sentencing range where that variance was based on the Court's discretion under Booker and § 3553(a) and not on a departure from the advisory Guidelines range. Nevertheless, if a court is contemplating a departure, it should continue to give notice as it did before Booker, see Cooper, 437 F.3d at 327, and district courts should be careful to articulate whether a sentence is a departure or a variance from an advisory Guidelines range.[6]

B.

In his next claim of error, Banks argues the District Court erred by issuing an *in personam* forfeiture judgment against him in the amount of $70,708.59, in direct relation to the proceeds of his mail fraud crimes. Banks takes the position that (1) the District Court lacked statutory authority under 28 U.S.C. § 2461(c) to issue a criminal forfeiture of his mail fraud proceeds; and (2) the District Court could not issue a forfeiture order for an amount that exceeded Banks's available assets at the time of sentencing. These are both issues of first impression in this Court. Because these issues present questions of law, we exercise plenary review. United States v. Ledesma-Cuesta, 347 F.3d 527, 530 (3d Cir. 2003).

1.

---

[6]While Banks does not raise the issue on appeal, we are satisfied the District Court engaged in sufficient review of the § 3553(a) factors. See Cooper, 437 F.3d at 329.

12

To place the issue of the District Court's statutory authority to issue the *in personam* forfeiture judgment in perspective, we consider the applicable statutory framework. In the second superseding indictment and its motion for a forfeiture judgment, the Government relied upon 28 U.S.C. § 2461(c) as grounds for obtaining criminal forfeiture of the proceeds of Banks's mail fraud proceeds.[7] The applicable edition of that statute reads,

> "If a forfeiture of property is authorized in connection with a violation of an Act of Congress, and any person is charged in an indictment or information with such violation but no specific statutory provision is made for criminal forfeiture upon conviction, the Government may include the forfeiture in the indictment or information in accordance with the Federal Rules of Criminal Procedure, and upon conviction, the court shall order the forfeiture of the property in accordance with the procedures set forth in section 413 of the Controlled Substances Act (21 U.S.C. 853), other than subsection (d) of that section."

28 U.S.C. § 2461(c).[8]

---

[7]Section 2461(c) is part of the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), Pub L. 106-185, § 16.

[8]We observe that § 2461(c) was amended on March 9, 2006, and now states:

> "If a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized, the Government may include notice of the forfeiture in the indictment or information pursuant to the Federal Rules of Criminal Procedure. If the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case pursuant to the Federal Rules of Criminal Procedure and section 3554 of title 18, United States Code. The procedures in section 413 of the Controlled Substances Act (21 U.S.C. 853) apply to

As pertains to mail fraud proceeds, criminal forfeiture for such proceeds is specifically authorized when special circumstances are present, such as when the mail fraud affects a financial institution, see 18 U.S.C. § 982(a).[9] Because no financial institution was involved in this case, the Government accordingly seeks criminal forfeiture for Banks's mail fraud proceeds under 28 U.S.C. § 2461(c) through the civil forfeiture provision, 18 U.S.C. § 981(a)(1)(C),[10] which does not require any special circumstances

all stages of a criminal forfeiture proceeding, except that subsection (d) of such section applies only in cases in which the defendant is convicted of a violation of such Act."

[9]In relevant part, 18 U.S.C. § 982 states,

"§ 982. Criminal forfeiture

(a)(1) The court, in imposing sentence on a person convicted of an offense in violation of section 1956, 1957, or 1960 of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.

(2) The court, in imposing sentence on a person convicted of a violation of, or a conspiracy to violate--

        (A) section . . . 1341 [mail fraud] . . . of this title, affecting a financial institution . . . ."

[10]In relevant part, 18 U.S.C. § 981 states,

"§ 981.  Civil forfeiture

(a)(1) The following property is subject to forfeiture to the United States:

        (C) Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting "specified unlawful

14

as a prerequisite to forfeiture for mail fraud crimes.

Banks contends that 28 U.S.C. § 2461(c) does not authorize such forfeiture because 18 U.S.C. § 982(a)(2)(A) provides for criminal forfeiture only in specific circumstances of mail fraud (i.e., mail fraud perpetrated against financial institutions) and no such circumstances are present here. Banks Br. at 48. As support for his argument, Banks cites to a district court opinion, United States v. Croce, 345 F. Supp.2d 492 (E.D. Pa. 2004) ("Croce II"), in which that court stated, "18 U.S.C. § 982(a)(2)(A) is a specific statutory provision made for criminal forfeiture upon conviction of mail fraud . . . so [28 U.S.C.] § 2461(c) does not authorize us to order criminal forfeiture of mail fraud proceeds." Id. at 496; see also id. at n.9. Thus, we must resolve whether 28 U.S.C. § 2461(c) authorizes criminal forfeiture of mail fraud proceeds that are not the result of mail fraud perpetrated against a financial institution.

To interpret the statute, we begin with its plain language. In re Armstrong World Indus., Inc., 432 F.3d 507, 512 (3d Cir. 2005). Ascribing plain meaning to the words of 28 U.S.C. § 2461(c), criminal forfeiture is not permitted unless (1) a substantive provision exists for civil forfeiture of the criminal proceeds at issue; and (2) there is no specific statutory provision that permits criminal forfeiture of such proceeds. Thus, we read the statute, enacted eight years after Congress last amended 18 U.S.C. § 982(a)(2), as a "bridge" or "gap-filler" between civil and criminal forfeiture, in that it permits criminal forfeiture when no criminal forfeiture provision applies to the crime charged against a particular defendant but civil forfeiture for that charged crime is nonetheless authorized. Accordingly, under our reading, § 2461(c) permits criminal forfeiture for general mail fraud because (1) 18

------

activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense."

Section 1956(c)(7) of Title 18 in turn references the offenses identified in 18 U.S.C. § 1961(1), which list of offenses includes mail fraud without any limitation to mail fraud perpetrated against financial institutions.

U.S.C. § 981(a)(1)(C) authorizes civil forfeiture for general mail fraud; and (2) no statutory provision specifically authorizes criminal forfeiture for general mail fraud.[11]  See United States v. Schlesinger, 396 F. Supp.2d 267, 275 (E.D.N.Y. 2005) (construing § 2461(c) as "a broad 'gap-filler'" that enables criminal forfeiture when civil forfeiture is permitted).

The district court in Croce II, on which case Banks relies, took a different, more restrictive view of § 2461(c).  That court concluded that by drafting 18 U.S.C. § 982(a)(2)(A) to permit criminal forfeiture only for mail fraud carried out against financial institutions, Congress had concluded that criminal forfeiture for mail fraud was "only appropriate when the mail fraud affected a financial institution."  345 F. Supp.2d at 496 n.9.  In that court's view, "[i]t seems highly unlikely that, in passing the broad language of § 2461(c), Congress intended to silently remove the limitations on criminal forfeiture in mail fraud cases that it had carefully inserted into § 982(a)(2)(A)."  Id.

Although Croce II presents a plausible construction of the statute, we are not persuaded.  Section 2461(c) authorizes criminal forfeiture where "a forfeiture is authorized in connection with a violation of an Act of Congress," which Act in this case is the civil forfeiture statute, 18 U.S.C. § 981.  Section 981 in turn permits forfeiture of proceeds from the crimes identified in 18 U.S.C. § 1956(c)(7).  Section 1956(c)(7) in turn includes the list of crimes set forth in 18 U.S.C. § 1961(1), which list of crimes includes "mail fraud," not only mail fraud "affecting a financial institution."  Accordingly, we read the plain language of § 2461(c), by virtue of

---

[11]Thus, § 2461(c) would *not* by itself enable criminal forfeiture proceeds from mail fraud against financial institutions, because a statutory provision for criminal forfeiture of proceeds from that kind of mail fraud, 18 U.S.C. § 982(a)(2)(A), already exists.  See United States v. Thompson, 2002 WL 31667859, at *2 (N.D.N.Y. Nov. 26, 2002) (disallowing criminal forfeiture of drug crime proceeds under § 2461(c) because charged drug crime had associated statutory provision for criminal forfeiture upon conviction).

16

the chain of cross-references leading to § 1956(c)(7) and § 1961(1), to explicitly permit criminal forfeiture for *general* mail fraud, not just for mail fraud against financial institutions. See United States v. Lebed, 2005 WL 2495843, at *8 (E.D. Pa. Oct. 7, 2005) (concluding that "by virtue of the cross reference from the civil forfeiture statute to the money laundering statute (§ 1956(c)(7)) and its cross reference to the RICO statute [§ 1961(1), listing crimes including general mail fraud], criminal forfeiture may now be invoked for general instances of mail and wire fraud, since these crimes do not contain any specific statutory provisions for criminal forfeiture."). Were we to conclude otherwise, we would be ignoring § 2461(c)'s cross-reference to a list of crimes that includes general mail fraud, and we are mindful that "[i]t is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001).

In sum, we reject Croce II and read the plain language of 28 U.S.C. § 2461(c) as permitting criminal forfeiture of proceeds from general mail fraud because a statutory provision – 18 U.S.C. § 981(a)(2)(C) – permits civil forfeiture of such proceeds and no criminal forfeiture provision applies to general mail fraud. Accord Lebed, 2005 WL 2495843, at *7-8; Schlesinger, 396 F.Supp. 2d at 275 ("[U]nder the plain terms of sec. 2461(c), criminal forfeiture for mail and wire fraud is permitted.").

To the extent that the text of the statute is ambiguous, our conclusion is bolstered by the legislative history of CAFRA and § 2461. Before Congress enacted CAFRA in 2000, if a forfeiture statute did not authorize a mode of recovery, that statute was deemed to authorize civil forfeiture only. Congress then enacted 28 U.S.C. § 2461(c) to extend the availability of criminal forfeiture to certain enumerated crimes that lacked an associated criminal forfeiture provision, observing:

> "[I]t makes sense to extend the availability of forfeiture to these other crimes. Rather then simply making civil forfeiture available for all federal crimes, some of which do not generate criminal proceeds, [CAFRA] would amend

17

sections 981(a)(1) and 982(a)(2) of title 18 to extend proceeds forfeiture (both civil and criminal) to the crimes enumerated in the money laundering statute, 18 U.S.C. § 1956(c)(7)."

H.R. Rep. 105-358, at *35 (1997); see also id. ("H.R. 1965 would amend section 2461 of title 28 to give the government the option of pursuing criminal forfeiture as an alternative to civil forfeiture if civil forfeiture is otherwise authorized."). Thus, Congress intended to expand the availability of criminal forfeiture to the comprehensive list of crimes referenced in 18 U.S.C. § 1956(c)(7), which list includes *general* mail fraud, not only mail fraud perpetrated against a financial institution.

The intent to provide for criminal forfeiture in general mail fraud cases is further demonstrated by Congress's decision in 2000 to amend the civil forfeiture statute, 18 U.S.C. § 981, by striking the language "affecting financial institutions" for mail and wire fraud crimes and inserting language permitting civil forfeiture for the crimes listed in 18 U.S.C. § 1956(c)(7). See Pub. L. 106-185, at § 20 (2000). In our view, Congress's expansion of the crimes for which civil forfeiture is available taken in conjunction with its decision to enact 28 U.S.C. § 2461(c), which broadened the range of crimes for which criminal forfeiture was available, can only be viewed as intent to make criminal forfeiture essentially co-extensive with civil forfeiture. Accordingly, we conclude the legislative history of 28 U.S.C. § 2461(c) provides additional support for our reading of the statute and our ultimate conclusion that the District Court had statutory authority to issue the *in personam* criminal forfeiture judgment.

2.

In his second attack on the District Court's *in personam* forfeiture order, Banks takes the position that the District Court could not issue a criminal forfeiture order for an amount that exceeded the value of his assets at the time of sentencing. See Banks Br. at 50-55 (citing United States v. Croce, 334 F. Supp.2d 781 (E.D. Pa. 2004) ("Croce I")). The Croce I court reasoned, based on a review of the history of forfeiture, that a defendant who

18

had obtained and subsequently dissipated unlawful proceeds could not be subject to a forfeiture order for those now-dissipated proceeds because one can not forfeit that which she does not own. See 334 F.Supp. 2d at 794. Based on our review of the applicable statutes, we disagree with Banks and reject the reasoning of Croce I.

In 28 U.S.C. § 2461(c), Congress stated that criminal forfeitures are to be carried out pursuant to the procedures set forth in 18 U.S.C. § 853. Section 853 states that the amount of a criminal forfeiture is directly related to the amount of the criminal proceeds: "[m]andatory forfeiture is concerned not with how much an individual has but with how much he received in connection with the commission of the crime." United States v. Casey, 444 F.3d 1071, 1077 (9th Cir. 2006) (citing 18 U.S.C. § 853). Thus, "[w]hen a defendant has been convicted of committing $1.6 million in money laundering offenses . . . the government has proved beyond a reasonable doubt that it is entitled to $1.6 million in criminal forfeiture." United States v. Voigt, 89 F.3d 1050, 1084 (3d Cir. 1996). Given that § 853 does not contain any language limiting the amount of money available in a forfeiture order to the value of the assets a defendant possesses at the time the order is issued, we think it clear that an *in personam* forfeiture judgment may be entered for the full amount of the criminal proceeds.[12]

In the interest of clarity, we emphasize that the District Court ordered a forfeiture judgment *in personam*. The *in personam* designation distinguishes this judgment from one *in rem*. See United States v. Sandini, 816 F.2d 869, 872-73 (3d Cir. 1987);

---

[12]As further evidence the statute was not intended to limit forfeitures to those assets available at the time of a forfeiture order, we observe that 18 U.S.C. § 853(o) states that "[t]he provisions of this section shall be liberally construed to effectuate its remedial purposes." By requiring a defendant to return his illicit gains without regard to his solvency, we believe the forfeiture judgment issued in this case serves the remedial purposes of 18 U.S.C. § 853 by combating mail fraud schemes and deterring those who would commit such crimes.

United States v. Hall, 434 F.3d 42, 59 (1st Cir. 2006) ("criminal forfeiture is a sanction against the individual defendant rather than against the property itself") (citations omitted). Furthermore, the *in personam* forfeiture judgment may also be distinguished from a general judgment *in personam*. The judgment *in personam* here is one in forfeiture and is limited by the provisions of 21 U.S.C. § 853(a) to:

> "(1) any property constituting, or derived from any proceeds the person obtained, directly or indirectly, as a result of such violation;
> (2) any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violations; . . . ."

21 U.S.C. § 853(a). In the event that property traceable to the crime is not available, the Court may direct forfeiture of "substitute property" subject to the conditions set out in 21 U.S.C. § 853(p). That provision applies, however, only if the traceable property:

> "A. Cannot be located upon the exercise of due diligence;
> B. Has been transferred or sold to, or deposited with, a third party;
> C. Has been placed beyond the jurisdiction of the Court;
> D. Has been substantially diminished in value; or
> E. Has been commingled with other property which cannot be divided without difficulty."

21 U.S.C. § 853(p). Federal Rule of Criminal Procedure 32.2 sets out the steps to be followed in forfeiture proceedings. It is apparent, therefore, that the scope of *in personam* judgment in forfeiture is more limited than a general judgment *in personam*.

We observe that adopting Banks's position would permit defendants who unlawfully obtain proceeds to dissipate those proceeds and avoid liability for their ill-gotten gains. Several other courts of appeals have rejected Banks's view of forfeiture. In United States v. Hall, the First Circuit observed that a money judgment permits the Government to collect on a forfeiture order "even if the defendant does not have sufficient funds to cover the

forfeiture at the time of conviction." 434 F.3d at 59. The First Circuit went on to note that permitting a money judgment as part of a forfeiture order "prevents a [criminal] from ridding himself of his ill-gotten gains to avoid the forfeiture sanction." Id. The Seventh Circuit reached the same conclusion in United States v. Baker, 227 F.3d 955 (7th Cir. 2000), where it reasoned that a forfeiture order "places a judgment lien against [defendant] for the balance of his prison term and beyond." Id. at 970. More recently, the Ninth Circuit concluded in United States v. Casey that a defendant's lack of assets at the time of his conviction does not allow him to sidestep a forfeiture judgment in the amount of his criminal proceeds: "money judgments are appropriate under § 853, *even in cases of insolvent defendants*." 444 F.3d at 1077 (emphasis added); see also United States v. Amend, 791 F.2d 1120, 1127 n.6 (4th Cir.), cert. denied, 479 U.S. 930 (1986) (observing that under § 853, "the government need not have offered evidence that the forfeitable assets were still in existence at the time of [defendant's] conviction"). Accordingly, we join these courts of appeals in concluding that *in personam* forfeiture judgments are appropriate under 18 U.S.C. § 853, even where the amount of the judgment exceeds the defendant's available assets at the time of conviction.

## C.

Next, Banks argues the evidence was insufficient to support his conviction for criminal copyright infringement. Banks takes the position that the Government did not prove, as is necessary to convict under 17 U.S.C. § 506(a),[13] that all of the items of software

---

[13]In relevant part, 17 U.S.C. § 506 states,

"(a) Criminal infringement. –

(1) In general.– Any person who willfully infringes a copyright shall be punished as provided under section 2319 of title 18, if the infringement was committed –

(A) for purposes of commercial advantage or

21

with which he was charged in the second superseding indictment with copying were in fact copyrighted works. Because Banks did not argue this theory before the District Court in his oral motion for acquittal, see App. 1140-41, we review only for plain error. United States v. Wolfe, 245 F.3d 257, 260 (3d Cir. 2001).

Under this standard, before we can correct an error not raised at trial, we must find: (1) an error; (2) that is plain; and (3) that affected substantial rights. United States v. Dobson, 419 F.3d 231, 236 (3d Cir. 2005) (citing United States v. Olano, 507 U.S. 725, 733-35 (1993)). If all three of these conditions are met, we may, in our discretion, grant relief, but only if "the error seriously affects the fairness, integrity, or public reputation of [the] judicial proceedings." Id. (citations omitted).

With our constrained standard of review in mind, we turn to the evidence offered at trial. The Government offered the testimony of an antipiracy specialist associated with the Microsoft company, who testified that Banks's copies of the Microsoft software in question were counterfeit, testimony that was not rebutted, and stated her belief that Microsoft's copyrights covered all of the software products at issue. Furthermore, the antipiracy specialist testified that Microsoft sent cease-and-desist letters to Banks, which letters were sent only to individuals who have allegedly infringed Microsoft software. We are persuaded that the jury's conclusion from this evidence that the software in question was copyrighted was not error and, in any event, given the testimony, was not an error that was plain. Accordingly, we conclude Banks has not shown the Government's evidence that the software in question was covered by copyright was so insufficient

---

private financial gain;

(B) by the reproduction or distribution, including by electronic means, during any 180-day period, of 1 or more copies or phonorecords of 1 or more copyrighted works, which have a total retail value of more than $1,000 . . . ."

22

as to constitute plain error.

D.

Banks next alleges the District Court's jury instruction regarding his charge of uttering and possessing counterfeit securities, under 18 U.S.C. § 513(a),[14] constituted reversible error because the instruction constructively amended his indictment. Banks Br. at 16. Because Banks did not object to this instruction at trial, we review it only for plain error. Dobson, 419 F.3d at 236.

A constructive amendment of an indictment occurs where a defendant is deprived of his "substantial right to be tried only on charges presented in an indictment returned by a grand jury." United States v. Syme, 276 F.3d 131, 148 (3d Cir. 2002) (Becker, J.) (citing United States v. Miller, 471 U.S. 130, 140 (1985)). Constructive amendments are "presumptively prejudicial under plain error review." Syme, 276 F.3d at 155.

Count Six of Banks's indictment charged him with uttering and possessing counterfeit *and* forged securities in violation of 18 U.S.C. § 513(a). App. 1401. The jury instructions, tracking the wording of the statute, informed the jury that Banks could be found guilty for uttering and possessing counterfeit *or* forged securities. App. 1264-65, 1267.

We considered this issue in United States v. Cusumano, 943 F.2d 305 (3d Cir. 1991). In that case, the defendant was indicted under a statute that presented multiple routes to a conviction in the

---

[14]Title 18, section 513(a) reads

"Whoever makes, utters or possesses a counterfeited security of a State or a political subdivision thereof or of an organization, or whoever makes, utters or possesses a forged security of a State or political subdivision thereof or of an organization, with intent to deceive another person, organization, or government shall be fined under this title or imprisoned for not more than ten years, or both."

23

disjunctive. As in this case, although the indictment was written in the conjunctive, the district court charged the jury in the disjunctive. On appeal, Cusumano argued the district court should have charged the jury in the conjunctive. We rejected that argument, observing that "the general rule is that when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive . . . the verdict stands if the evidence is sufficient with respect to any of the acts charged," id. at 311, and held that the rule extended to cases where the indictment is in the conjunctive, but the jury instructions were in the disjunctive. Id.

Here, like Cusumano, while Banks's indictment was phrased in the conjunctive, the jury instructions – which tracked the language of the statute – were phrased in the disjunctive. Furthermore, Banks does not argue the evidence was insufficient with respect to any of the acts charged under 18 U.S.C. § 513. See Cusumano, 943 F.2d at 311. Accordingly, we perceive no plain error in the District Court's jury instructions regarding 18 U.S.C. § 513.

E.

Banks next argues that the District Court's jury instruction on the witness tampering charge at Count Seven was defective because the District Court judge did not instruct the jury on the requirement, recently clarified by the Supreme Court in Arthur Andersen LLP v. United States, 125 S. Ct. 2129 (2005), that a conviction under 18 U.S.C. § 1512(b)(2)(A) requires there be a nexus between the persuasion Banks allegedly directed at Do and a particular proceeding.[15] Because Banks did not object to the jury

---

[15]In relevant part, § 1512 reads,

"(b) Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to –

(2) cause or induce any person to –

24

instruction at trial, we are constrained to plain error review, Dobson, 419 F.3d at 236, and further note that "[i]t is a rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." Henderson v. Kibbe, 431 U.S. 145, 154 (1977).

In Arthur Andersen, the Supreme Court made clear that a prosecution under this same statute cannot succeed if the Government fails to show a "nexus between the 'persuasion' to [impede] and any particular proceeding." 125 S.Ct. at 2136. As the Second Circuit recently observed in the wake of Arthur Andersen, "[t]he touchstone for the nexus requirement, therefore, is an act taken that would have the natural and probable effect of interfering with a judicial or grand jury proceeding that constitutes the administration of justice; that is, the act must have a relationship in time, causation, or logic with the judicial proceedings." United States v. Quattrone, 441 F.3d 153, 171 (2d Cir. 2006).

We turn to the jury instructions in this case. The witness tampering instruction read, in relevant part, as follows:

". . . The second element the Government must prove beyond a reasonable doubt is that the Defendant acted knowingly and with the specific intent to cause or induce any person to withhold a record document or other object from an official proceeding. By 'specific intent,' I mean that the Defendant must have acted with the unlawful intent to cause or induce Warren Do to withhold evidence from an official proceeding. It is not necessary for the Government to prove the Defendant knew he was breaking any particular criminal law, nor need the government prove that the Defendant knew that the official proceeding was before a federal grand jury. An official proceeding includes a

(A) withhold testimony, or withhold a record, document, or other object, from an official proceeding."

25

proceeding before a federal grand jury. The grand jury proceeding need not be pending or about to be instituted at the time of the offense."

App. 1271-72. Following a discussion of attempt, the District Court instructed,

"Thus, in order to prove the offense of attempted witness tampering . . . it is necessary that the totality of the evidence of the Defendant's objective actions, wholly apart from any evidence of his state of mind, be consistent with the purpose of the commission of the crime of witness tampering."

App. 1273-74.

With our restrictive standard of review in mind, we perceive no error with the jury instructions in this case, and conclude that Arthur Andersen does not compel a different conclusion. As is evident, the jury was instructed that Banks could be found guilty of witness tampering only if he acted with the specific intent to induce Do to withhold evidence from an official proceeding, and that Banks did not have to intend to affect a grand jury proceeding – other types of proceedings would suffice. App. 1272. We read this instruction as requiring the jury to find some connection – i.e., a nexus – between Banks's actions and an official proceeding in that Banks could not be convicted unless the jury found he intended to persuade Do to impede an official proceeding, which official proceeding – given Do's email regarding his subpoena – Banks was well aware of. Thus, we perceive no plain error in the District Court's witness tampering instruction as reviewed against Arthur Andersen.[16]

_____

[16]Arthur Andersen is perhaps distinguishable because the district court in that case led the jury to believe that no nexus between the persuasion and any particular proceeding was necessary to convict. See 125 S. Ct. at 2136-37; see also Quattrone, 441 F.3d at 180-81 & 180 n.27 (vacating conviction for jury instruction's lack of nexus requirement; instruction read "there is *no requirement there be a nexus* between the defendant's

26

F.

Next, Banks claims the District Court committed reversible error by failing to rule on what he alleges was a motion for self-representation, docketed by the District Court on January 28, 2005. Banks Br. at 26. As to this issue, we exercise plenary review over the District Court's legal conclusions and review its factual findings for clear error. United States v. Peppers, 302 F.3d 120, 127 (3d Cir. 2002).

In evaluating a district court's treatment of a defendant's request to act *pro se* at trial, Peppers, 302 F.3d at 132, and at sentencing, cf. United States v. Salemo, 61 F.3d 214, 219 (3d Cir. 1995), this Court applies a three-step analysis. This analysis requires that the Court (1) inquire into whether the defendant has asserted his desire to proceed *pro se* clearly and unequivocally; (2) inquire into whether the defendant understands "the nature of the charges, the range of possible punishments, potential defenses, technical problems that the defendant may encounter, and any other facts important to a general understanding of the risks involved"; and (3) "assure itself" that the defendant is competent to stand trial. Peppers, 302 F.3d at 132 (citations and quotations omitted). Because Banks contests only whether his motion was sufficiently unequivocal, Banks Br. at 26, our analysis in this case does not proceed beyond the first step.

Although Banks was represented by counsel, he nevertheless filed multiple *pro se* requests with the District Court. See App. 14-37 (District Court docket entries).[17] The written

conduct and the federal proceeding such that the defendant's conduct would have had a natural and probable effect of interfering with the federal proceeding") (emphasis added). Unlike these cases, the jury instruction in this case did not direct the jury to reach a guilty verdict without regard to a nexus between Banks's conduct and the official proceeding.

[17]We observe that the District Court docket is replete with *pro se* motions that Banks filed while represented by counsel. See,

27

request at issue read as follows:

> "Motion/Defendant Invokes his Constitutional Right to Represent Himself prose Until Such a Time that it is determined that [AUSA] Paul Hull Will Acknowledge his pro se Motions As The Defendant Has a Constitutional Right To File Motion's pro se that the Court Rules on And Are Responded To by the USA At Such A Time THAT IT IS DETERMINED THAT DEFENDANT Pro se MOTIONS WILL NOT BE IGNORED BY PAUL HULL THE DEFENDANT INTENDS TO INVOKE HIS RIGHT TO COUNSEL BY MR. DAVID CHONTOS BUT UNTIL THAT TIME DEFENDANT IS PRO SE AT Criminal No. 03-245
>
> And Now comes the defendant pro se and avers :
>
> 1. See Header
> 2. Any responses should be forwarded to the defendant

_____

e.g., App. 28 (Dkt. No. 153 – "MOTION by FREDERICK H. BANKS for Additional Law Library Access"); App. 29 (Dkt. No. 162 – "MOTION by FREDERICK H. BANKS Demanding that Angelica Bonta, U.S. Probation Officer and Paul Hull, Assistant U.S. Attorney Acknowledge the PSI Objections he filed with and FOIA/Privacy Act Request to the Probation Office"); App. 29 (Dkt. No. 169 – "MOTION by FREDERICK H. BANKS to Receive Pleadings (document numbers indicated in motion) and all of Brady/Jencks material"). We note that the District Court, perhaps in an attempt to retain control of the proceedings in the face of the Banks's onslaught of *pro se* motions, ordered on March 8, 2005, that the Clerk of Court was not to accept any further *pro se* filings from Banks. App. 34. The District Court was within its authority to do so. Cf. United States v. Essig, 10 F.3d 968, 973 (3d Cir. 1993) (observing that this Court is not required to review a counseled defendant's *pro se* argument; "[i]ssues that counseled parties attempt to raise *pro se* need not be considered except on a direct appeal in which counsel has filed a [brief under Anders v. California, 386 U.S. 738 (1967)]").

directly and the defendants standby counsel/counsel withholding responses to motion and motions made by the USA violates defendants due process.

WHEREFORE, the defendant respectfully demands that the motion/Defendant invokes, et al. be GRANTED."

App. 1439 (capitals in original). We must "indulge every reasonable presumption against waiver of the right to counsel," United States v. Stubbs, 281 F.3d 109, 117 (3d Cir. 2002) (citing Johnson v. Zerbst, 304 U.S. 458, 464 (1938)), and observe that an inquiry into the nature of an alleged request to proceed *pro se* at sentencing "need *not* be as exhaustive and searching as a similar inquiry before the conclusion of trial." Salemo, 61 F.3d at 219 (emphasis added). With this in mind, we conclude Banks's written request did not require any action on the part of the District Court.

The first step of the Peppers inquiry requires an investigation into whether the defendant "clearly and unequivocally" asserted his request. Here, while Banks's request was titled, "Defendant Invokes his Constitutional Right to Represent Himself prose," Banks in actuality requested only temporary self-representation in that he stated he would engage Attorney Chontos to represent him as soon as AUSA Hull ceased ignoring his other *pro se* motions. We view this only as an expression of Banks's frustration with AUSA Hull's refusal to respond to his other *pro se* motions and not as a clear request to proceed *pro se*, further noting that Banks was complaining only about AUSA Hull and *not* about his own counsel. See Buhl v. Cooksey, 233 F.3d 783, 792 (3d Cir. 2000) (noting concern with permitting a defendant's waiver of counsel based on mere "musings on the benefits of self-representation"). Hence, we read Banks's motion as an expression of his frustration with our judicial process's requirement that communications take place between attorneys, not between parties and attorneys, and not as a clear request for self-representation. Cf. Jackson v. Ylst, 921 F.2d 882, 888-89 (9th Cir. 1990) ("The trial court properly may deny a request for self-representation that is 'a momentary caprice or the result of thinking out loud.'") (citation omitted).

In addition, Banks does not identify any motions to which

29

AUSA Hull failed to respond after Banks filed his motion for *pro se* representation, and, when asked, expressed no dissatisfaction with his counsel's performance at sentencing.  See App. 1337.  Accordingly, we conclude, on the facts of this case, that Banks's written request was not sufficiently clear so as to trigger any duty on the part of the District Court to address the request as a bona fide motion to proceed *pro se* and perform a full Peppers inquiry.

G.

Banks finally argues that Judge Hardiman should have *sua sponte* recused himself from this case before sentencing.  Banks's argument is based on a judicial misconduct complaint he filed against Judge Hardiman before sentencing took place on February 25, 2005, but Banks did not file a motion for recusal until April 25, 2005, well after his sentencing.  App. 36.  We review the District Court's decision not to *sua sponte* recuse for plain error.  Selkridge v. United of Omaha Life Ins. Co., 360 F.3d 155, 166 (3d Cir. 2004).[18]

Under 28 U.S.C. § 455, a judge must "disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  United States v. Bertoli, 40 F.3d 1384, 1412 (3d Cir. 1994).  Beliefs or opinions that merit recusal must involve an extrajudicial factor; "[f]or example, if a judge has acquired a dislike of a litigant because of events occurring outside of the courtroom, a duty to recuse might ensue."  United States v. Antar,

---

[18]Banks raised the issue of recusal only after the District Court trial and sentencing proceedings at issue had ended, which we deem a failure to timely raise the issue which accordingly constrains us to plain error review.  See United States v. Viscome, 144 F.3d 1365, 1370 (11th Cir. 1998) (reviewing defendant's constitutional challenge to statute of conviction for plain error where defendant did not raise constitutional challenge to statute until after trial); see also Lyons v. Jefferson Bank & Trust, 994 F.2d 716, 722-23 (10th Cir. 1993) (observing that "an untimely motion, by itself, is not sufficient to preserve an issue for appellate review").

53 F.3d 568, 574 (3d Cir. 1995). To have cause to recuse, a judge must have actual knowledge of the alleged grounds for recusal; "[t]he evil that a timeliness requirement is intended to prevent – namely, holding in reserve a recusal demand until such time that a party perceives a strategic advantage – is served by requiring actual knowledge." In re Kensington Int'l. Ltd., 368 F.3d 289, 294 (3d Cir. 2004).

On the circumstances presented here, we perceive no need for Judge Hardiman to have recused himself on his own initiative from Banks's sentencing. Even assuming that Judge Hardiman had actual knowledge of Banks's complaint *before* sentencing,[19] Banks had already deluged the District Court with numerous and frivolous *pro se* motions throughout the proceedings, and we are unwilling to conclude that Judge Hardiman erred by not *sua sponte* recusing himself from sentencing simply because Banks, a convicted defendant who had already clogged the proceedings with *pro se* motions, also filed a judicial misconduct complaint in addition to his other *pro se* motions. Cf. Martin v. Monumental Life Ins. Co., 240 F.3d 223, 237 (3d Cir. 2001) ("We also believe that there must be a more compelling standard for recusal under § 455(a) after the conclusion of a trial than before its inception. After a massive proceeding such as this, when the court has invested substantial judicial resources and there is indisputably no evidence of prejudice, a motion for recusal of a trial judge should be supported by substantial justification, not fanciful illusion.").[20]

_____

[19]The record is at best unclear as to when Judge Hardiman actually learned of Banks's misconduct complaint.

[20]We observe that Banks's own comments at the March 17, 2005, recusal hearing before Judge Hardiman indicate an agreement with our conclusion on this issue. At that hearing, Judge Hardiman recused himself from a separate criminal case involving Banks, Case Number 04-176, on the ground that Banks had filed a judicial misconduct complaint against him in the instant case, and the following exchange took place:

The Court:  In light of the pending complaint of judicial misconduct that Mr. Banks filed against me, I think

IV.

For the foregoing reasons, we will affirm Banks's convictions for mail fraud, criminal copyright infringement, uttering and possessing counterfeit or forged securities, and witness tampering in their entirety. We will also affirm Banks's sentence, concluding (1) the District Court was not obligated to provide advance notice under Rule 32(h) of its intent to vary from a Guidelines sentence where that variance was based on full consideration of the § 3553(a) factors and not on the Guidelines; and, (2) that the District Court had statutory authority to issue an *in personam* criminal forfeiture judgment, regardless of whether the amount of that judgment exceeded Banks's available assets at the time of conviction.

---

                    my impartiality might reasonably be questioned. So for that reason, I'm going to recuse myself from presiding over case 04-176, pursuant to Title 28 United States Code, Section 455(a).

Banks:      Your Honor, I don't think that that is appropriate because anyone can file a judicial misconduct complaint and we can't have judges recusing themselves because somebody filed a complaint. Anybody can do that.