

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-16-2007

# USA v. Rodriguez-Rijo

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-3223

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"USA v. Rodriguez-Rijo" (2007). *2007 Decisions.* Paper 1105.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1105

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

IN THE UNITED STATES COURT
OF APPEALS
FOR THE THIRD CIRCUIT

NO. 05-3223

UNITED STATES OF AMERICA

v.

BAUTISTA RODRIGUEZ-RIJO,
Appellant

On Appeal From the District Court
of the Virgin Islands,
Division of St. Thomas and St. John
(D.C. Crim. Action No. 01-cr-00298-3)
District Judge:  Hon. Raymond L. Finch

Submitted Pursuant to Third Circuit LAR 34.1(a)
May 8, 2007

BEFORE:  SLOVITER, STAPLETON and
VAN ANTWERPEN, Circuit Judges

(Opinion Filed: May 16, 2007)

OPINION OF THE COURT

STAPLETON, Circuit Judge:

Appellant, Bautista Rodriguez-Rijo, appeals his judgment of conviction and sentence following a jury trial in the District Court of the Virgin Islands. For the reasons that follow, we will affirm the judgment of the District Court.

I.

On October 11, 2001, Rodriguez-Rijo was charged in a three-count indictment with conspiracy to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii) and 846; conspiracy to import into the United States five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 952(a), 960(b)(1)(B)(ii), and 963; and conspiracy to possess with intent to distribute five kilograms or more of cocaine on board a vessel that was subject to the jurisdiction of the United States, in violation of 46 U.S.C.App. § 1903 and 18 U.S.C. § 371.

At trial, the government presented evidence that on the night of September 19, 2001, and into the early hours of the following day, the United States Coast Guard, with the assistance of other law enforcement agencies, apprehended two vessels in the waters between St. Maarten and St. Thomas. Upon boarding the First Vessel, law enforcement officials discovered twenty bales of cocaine totaling 498.5 kilograms. They also discovered a piece of paper bearing a ten-digit number that was later found to match the telephone number of a cellular phone seized from the Second Vessel. The piece of paper also listed the coordinates of the location where law enforcement officials would discover

2

the Second Vessel, which was less than one mile away from the First Vessel. Julio Balbuena-Peru, one of the individuals apprehended on the First Vessel, testified that he was supposed to be paid $10,000 to transport the cocaine from St. Maarten to a second vessel, which was coming from St. Thomas, at a predetermined location in the open water.

The Second Vessel, a "go-fast vessel" of the type commonly used by drug smugglers, SA at 16, 25, 29, 119, was occupied by Rodriguez-Rijo and two others. After a Coast Guard helicopter illuminated the Second Vessel, which had its navigation lights turned off, the vessel increased its speed and attempted to flee. A high-speed chase ensued, ending only after warning shots were fired from one of the police vessels in hot pursuit. In addition to the cellular phone, Coast Guard officials seized two large fuel containers and a blue tarp from the Second Vessel, but found no drugs aboard. They determined that Rodriguez-Rijo was the "master," or captain, of the Second Vessel because "he was answering all the questions, . . . took charge of the situation, . . . [and] came forward with everything." SA at 41.

Rodriguez-Rijo subsequently waived his rights and agreed to speak with Special Agent Mark McHugh. Rodriguez-Rijo advised McHugh that, approximately one month before his arrest, he had transported the Second Vessel from Puerto Rico to St. Thomas for a fee of $1,500. Rodriguez-Rijo also told McHugh that, on the night the Second Vessel was apprehended, he was taking the vessel from St. Thomas to St. Maarten to

"look for job opportunities," SA at 116; he was not using the vessel's navigational lights because "the people in Tortola were not nice," SA at 117; and he "decided to give [the vessel] a little gas" and flee from the police because the vessel "was not [approved] for [carrying] passengers." SA at 117-18. According to McHugh, Rodriguez-Rijo had "no explanation" for why he was traveling in the middle of the night. SA at 116. When asked by McHugh to explain the Second Vessel's close proximity to a vessel carrying cocaine, Rodriguez-Rijo lowered his head, began to cry, and indicated that he felt sorry for his children.

Ramon Ivan Abbott Placencio, a cooperating witness, testified that he was involved in the plan to smuggle drugs from St. Maarten to St. Thomas. As documented by undercover surveillance video and the testimony of various law enforcement officers, Placencio spent ten days in a St. Thomas hotel in August 2001, during which time he was seen inspecting the Second Vessel, purchasing a cell phone that was later found aboard the First Vessel, and spending time with various participants in the plan, including Rodriguez-Rijo. Placencio testified that Rodriguez-Rijo, among other participants in the conspiracy, stayed at the St. Thomas hotel with him and that he discussed the drug smuggling scheme with Rodriguez-Rijo. According to Placencio, Rodriguez-Rijo's role in the scheme was "to be the captain of the boat, using the boat that we had here . . . basically to go out and to receive a shipment of drug[s] that was on the way." SA at 96.

The jury found Rodriguez-Rijo guilty on all counts. The District Court sentenced

Rodriguez-Rijo to a term of imprisonment of 292 months, which was based in part on a two-point enhancement under USSG § 3B1.3 for use of a "special skill" (viz., piloting the Second Vessel) in committing the offense. This appeal followed.[1]

## II.

Rodriguez-Rijo first argues that the District Court committed reversible error in allowing one of the government's witnesses to testify concerning a previous drug seizure from the Second Vessel which did not involve Rodriguez-Rijo. In response to a question by the government's counsel concerning the Second Vessel's registration information, Special Agent McHugh testified in part that he was "aware that this was the same vessel that I had observed . . . on previous occasions in St. Thomas, and that approximately one year earlier was involved in the seizure of 866 kilograms of cocaine in Puerto Rico." SA at 121. On appeal, Rodriguez-Rijo challenges the admissibility of this testimony on several grounds, including relevance. Because Rodriguez-Rijo did not object to the challenged testimony at trial, however, he properly concedes that plain error review applies here.

Under plain error review, "[t]he defendant must show not only that error affected the outcome of the trial, but that the error was clear or obvious under current law. If these requirements are met, we *may* reverse, if the error seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *United States v. Rivas*, 479 F.3d

_____

[1]We have jurisdiction pursuant to 28 U.S.C. § 1291.

5

259, 263 (3d Cir. 2007) (citations omitted).  Even assuming that admission of the

challenged testimony was clearly erroneous, which the government appears to concede

for the sake of argument, we agree with the government that Rodriguez-Rijo has failed to

make a sufficient showing of prejudice to warrant relief from his conviction on this basis.

Putting aside the past use of the Second Vessel by other drug traffickers, there remains a

vast array of evidence that far more persuasively links both Rodriguez-Rijo and the

Second Vessel to the present drug conspiracy, as recounted in detail above.  In short, we

have no doubt that any error in admitting the challenged testimony did not affect the

outcome of this case.

### III.

Rodriguez-Rijo next challenges the District Court's application of a two-point

adjustment under USSG § 3B1.3 for use of a "special skill" in operating the Second

Vessel.[2]  Rodriguez-Rijo argues that the District Court erred in applying the § 3B1.3

adjustment because he did not, in fact, operate the Second Vessel.  In the alternative,

Rodriguez-Rijo contends that the § 3B1.3 enhancement was unwarranted because he did

---

[2]USSG § 3B1.3 provides for a two-point enhancement where "the defendant . . . used a special skill . . . in a manner that significantly facilitated the commission or concealment of the offense."  The Commentary to § 3B1.3 defines "special skill" as "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing.  Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts."  USSG § 3B1.3, cmt. 3.  "Special skills are not, however, limited to those obtained through formal education, training, or licensing . . . [and] may be obtained through life experience and self-study."  *United States v. Batista De La Cruz*, 460 F.3d 466, 468 (3d Cir. 2006).

not use any "special skill" in operating the Second Vessel. We reject both arguments.[3]

Contrary to Rodriguez-Rijo's suggestion, there is ample evidence from which the District Court could conclude that he was responsible for piloting the Second Vessel. Most relevant is Rodriguez-Rijo's own admission to Special Agent McHugh that it was he who controlled the vessel's navigation and accelerated its speed upon detection by law enforcement authorities.

Furthermore, we believe that the District Court properly found that Rodriguez-Rijo used a "special skill" in piloting the Second Vessel as part of the drug conspiracy. Although Rodriguez-Rijo urges us to follow our recent decision in *United States v. Batista De La Cruz*, 460 F.3d 466 (3d Cir. 2006), we believe that case is factually distinguishable. In *Batista De La Cruz,* we reversed the trial court's application of the "special skill" enhancement where the defendant, who had been apprehended while transporting drugs in a powerboat, "employed simple line-of-sight navigation to reach St. Thomas [from Puerto Rico]"; "[t]he authorities found no charts, compasses or other navigational devices on his boat"; he "operated his boat during day light hours"; and "[t]he record fail[ed] to reflect that he had any licensing, or even any special skill obtained through education, self-study, or experience." *Id.* at 469.

_____

[3]Although neither party has raised the issue, it does not appear from our review of the record that Rodriguez-Rijo ever raised an objection to the § 3B1.3 adjustment before the District Court. Because we conclude that the District Court did not err in applying the § 3B1.3 enhancement, however, there is no need to conduct a plain error analysis.

In this case, by contrast, Rodriguez-Rijo piloted a high-speed vessel, in the darkness of night and without using navigation lights, to a predetermined location in the open ocean. Once detected, Rodriguez-Rijo attempted to elude apprehension by leading law enforcement authorities on a high-speed chase across the dark sea. The record also reveals that Rodriguez-Rijo had prior experience piloting this very vessel, for which he received substantial compensation.

In our view, these facts and circumstances are far more analogous to those at issue in *United States v. Calderon*, 127 F.3d 1314 (11th Cir. 1997), a case we favorably discussed, but ultimately found to be factually distinguishable, in *Batista De La Cruz*. In *Calderon*, the Eleventh Circuit expressed its disbelief that "an average person off the street would possess the requisite skills to captain a cocaine laden boat on the high seas from the Bahamas to a predetermined specific location in Southern Florida using a chart and compass at night without lights while taking care to elude detection," as the defendants had done in that case. *Id.* at 1339-40. We believe that members of the general public would lack the skills necessary to successfully perform the nearly identical task entrusted to Rodriguez-Rijo in this case. We conclude, therefore, that the District Court did not err in applying the two-level "special skill" enhancement pursuant to § 3B1.3.

IV.

Rodriguez-Rijo finally argues that the sentence imposed upon him by the District Court is unreasonable under *United States v. Booker*, 543 U.S. 220 (2005), because the

8

District Court failed to address his request for a reduced sentence based on his lack of

prior criminal history and did not adequately consider the sentencing factors set forth in

18 U.S.C. § 3553(a).[4]

Under our post-*Booker* precedent, district courts must give "meaningful

consideration to the *relevant* § 3553(a) factors" in imposing sentence. *United States v.*

*Charles*, 467 F.3d 828, 831 (3d Cir. 2006) (citation and internal brackets omitted). The

district court is not required to "discuss and make findings as to each of the § 3553(a)

---

[4]Those factors are:
   (1) the nature and circumstances of the offense and the history and
   characteristics of the defendant;
   (2) the need for the sentence imposed –
         (A) to reflect the seriousness of the offense, to promote respect for
         the law, and to provide just punishment for the offense;
         (B) to afford adequate deterrence to criminal conduct;
         (C) to protect the public from further crimes of the defendant; and
         (D) to provide the defendant with needed educational or vocational
         training, medical care, or other correctional treatment in the most
         effective manner;
   (3) the kinds of sentences available;
   (4) the applicable category of offense committed by the applicable category
   of defendant as set forth in the guidelines . . . ;
   (5) any pertinent policy statement . . . issued by the Sentencing Commission
   . . . that . . . is in effect on the date the defendant is sentenced[;]
   (6) the need to avoid unwarranted sentencing disparities among defendants
   with similar records who have been found guilty of similar conduct; and
   (7) the need to provide restitution to any victims of the offense.
18 U.S.C. § 3553(a).
   Because the absence of prior criminal history is not a recognized basis for
departing downward under the Guidelines, we interpret Rodriguez-Rijo's sentencing
argument as a request for a "variance" under § 3553(a). *See United States v. Vampire*
*Nation*, 451 F.3d 189, 195 n.2 (3d Cir. 2006) (characterizing "post-*Booker* discretionary
sentences not based on a specific Guidelines departure provision as 'variances'").

9

factors if the record makes clear the court took the factors into account in sentencing," *United States v. Cooper*, 437 F.3d 324, 329 (3d Cir. 2006)*, nor must the district court "discuss every argument made by a litigant if an argument is clearly without merit." *Id.* At bottom, "[t]here are no magic words that a district judge must invoke when sentencing, but the record should demonstrate that the court considered the § 3553(a) factors and any sentencing grounds properly raised by the parties which have recognized legal merit and factual support in the record." *Id.* at 332; *see also United States v. Dragon*, 471 F.3d 501, 506 (3d Cir. 2006) (noting that "we will not elevate form over substance" in conducting reasonableness review).

In advance of the sentencing hearing, the Probation Department submitted a Presentence Investigation Report ("PSI Report") calculating the advisory Guideline range as 292 to 365 months, based on a total offense level of 40[5] and a criminal history category of I. At the sentencing hearing, defense counsel asked the District Court to impose a reduced sentence based on the fact that "this is [Rodriguez-Rijo's] first conviction." SA at 150. In response, the government recommended a sentence of 292 months imprisonment, arguing that Rodriguez-Rijo's role as the "boat captain" made him "more culpable" than the other conspirators aboard the Second Vessel. SA at 151. After

---

[5]The base offense level for a drug crime involving at least 150 kilograms of cocaine is 38. *See* USSG § 2D1.1. Adding the two-point special skills adjustment under § 3B1.1 results in a total offense level of 40. While Rodriguez-Rijo challenged the drug quantity calculation before the District Court, he does not press this argument on appeal.

considering the "the statements of [Rodriguez-Rijo's] lawyer, . . . the probation report, and the arguments of the government," and "find[ing] that the sentencing guidelines are advisory in this case," the District Court "accepted the recommendations of the [PSI Report]" and sentenced Rodriguez-Rijo to a prison term of 292 months, at the bottom end of applicable advisory Guidelines range. SA at 152. The District Court stated that Rodriguez-Rijo's sentence was based on the "same justification" cited by the Court in sentencing co-defendant Rufino Rodriguez-Sanchez to a prison sentence of 250 months,[6] "except that [this case] is a little bit more egregious in that [Rodriguez-Rijo was] the captain of the vessel . . . [a]nd I think this fact should be reflected in the sentence." SA at 152.

Although the District Court did not expressly reference the individual sentencing factors of § 3553(a) in the course of imposing sentence on Rodriguez-Rijo, the Court's sentencing analysis is nevertheless "consistent with the relevant provisions of § 3553(a)," which is all our *post-Booker* precedent requires. *Dragon*, 471 F.3d at 506. It is clear from the record that the District Court found a prison sentence of 292 months to be appropriate based not only on its consideration of the applicable advisory Guidelines

_____

[6]The District Court provided the following explanation for the sentence imposed upon co-defendant Rodriguez-Sanchez, whose sentencing hearing was held immediately prior to Rodriguez-Rijo's hearing: "If this shipment of drugs had not been intercepted, it would have been a large quantity of drugs arriving at somebody's territory or state. The activity in which you were involved suggests that you deliberately set out to infuse drugs someplace, some community, and I think you knew what you were doing, and you deliberately took a chance, and you d[id] so at considerable risk to yourself." SA at 149.

11

range, which the District Court properly acknowledged to be "advisory" in nature, but also in light of the serious nature of the drug conspiracy and Rodriguez-Rijo's extensive involvement therein, and the pressing need to promote respect for the law, provide just punishment, and protect the public from such crimes. The District Court was also careful to explain that the minor disparity between Rodriguez-Rijo's sentence and the lesser sentence imposed upon co-defendant Rodriguez-Sanchez was warranted in view of their respective roles in the drug smuggling plan. Furthermore, we can readily infer from the District Court's reasoned analysis that it did not believe Rodriguez-Rijo's lack of prior criminal history, which was expressly considered in computing the advisory Guidelines range, supported a reduced sentence when weighed against the other relevant § 3553(a) factors discussed above. In short, we conclude that the sentencing procedure employed by the District Court here was reasonable under *Booker*.

V.

For the foregoing reasons, the judgment of the District Court will be affirmed.

12