PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-4023
_____

UNITED STATES OF AMERICA

v.

BARRY SUSSMAN,

                              Appellant
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Crim. No. 2-08-cr-00891-001)
Honorable Dickinson R. Debevoise, District Judge

_____

Argued December 13, 2012

BEFORE:  GREENAWAY, JR., GREENBERG, and COWEN,
Circuit Judges

(Filed: March 06, 2013)
_____

1

Mark E. Coyne
John F. Romano (argued)
Office of the United States Attorney
970 Broad Street
Room 700
Newark, NJ 07102-0000

    Attorneys for Appellee

Peter Goldberger (argued)
50 Rittenhouse Place
Ardmore, PA 19003
David A. Ruhnke
Ruhnke & Barrett
47 Park Street
12th Floor
Montclair, NJ 07042-0000

    Attorneys for Appellant

_____

OPINION OF THE COURT
_____

GREENBERG, <u>Circuit</u> <u>Judge</u>.

## I. INTRODUCTION

This matter comes on before this Court on an appeal from a final judgment of conviction and sentence entered against appellant Barry Sussman ("Sussman") on October 8, 2009. The government initiated this criminal case on May 12, 2008, when

2

it filed a complaint against Sussman in the District Court. The charges stemmed from an underlying civil action in which the Federal Trade Commission ("FTC") secured a judgment against Sussman and his co-defendants in the amount of $10,204,445, as well as equitable relief by reason of their abusive debt collection activities. On December 9, 2008, a grand jury in the District of New Jersey returned a two-count indictment against Sussman in these criminal proceedings. After a five-day trial in May 2009 the jury found him guilty on one count of theft of government property, in violation of 18 U.S.C. § 641, and one count of obstruction of justice, in violation of 18 U.S.C. § 1503(a). On October 5, 2009, the District Court sentenced Sussman to an imprisonment term of 41 months on each count, to be served concurrently, followed by three years of supervised release. The Court also imposed a $15,000 fine and a $200 special assessment. The Court entered a judgment of conviction and sentence reflecting the sentence it imposed on October 8, 2009.

On October 15, 2009, Sussman filed a timely notice of appeal. He now challenges the jury's verdict on insufficiency of the evidence grounds. In an alternative argument Sussman contends that he should be afforded a new trial because a portion of the trial transcript is unavailable, apparently because a court reporter lost the transcript. He also contends that the District Court erred in admitting redacted documents from the FTC's prior civil case against him into evidence. Finally, he argues that the District Court improperly instructed the jury on the elements of Count Two, obstruction of justice, and failed to include his proposed "theory of defense" instruction in its jury charge. For the reasons discussed below, we will affirm.

## II. BACKGROUND

On May 12, 2003, the FTC brought the civil action to which we have referred against certain defendants, including Sussman, Check Investors, Inc., a company he controlled, and another one of Sussman's companies, pursuant to section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), and section 814(a) of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692l(a). In the civil action the FTC sought a temporary restraining order ("TRO") to safeguard certain assets the defendants held so that they would be available for satisfaction of any judgment that it might obtain. The district court[1] granted the TRO and included an asset freeze provision prohibiting the "[o]pening or causing to be opened [of] any safe deposit boxes titled in the name of any Defendant, or subject to access by any Defendant." App. at 619. On August 14, 2003, the district court granted a preliminary injunction that continued the freeze on the defendants' safe deposit boxes in the civil action. App. at 184. On July 18, 2005, the district court issued a final order granting a permanent injunction prohibiting the defendants from participating in debt collection activities and entitling the FTC to judgment against the defendants in the amount of $10,204,445. App. at 679-81. The final order required the FTC to use the proceeds recovered on the judgment for equitable relief to the victims of the defendants' wrongdoing and then to transfer any remaining funds to the United States

---

[1] The civil and criminal cases against Sussman took place in the United States District Court for the District of New Jersey. For clarity, we only will capitalize District Court when referring to the criminal case.

4

Treasury as equitable disgorgement. App. at 689. The order provided that "Defendants shall have no right to challenge the FTC's choice of remedies or the manner of distribution." App. at 689. Under the section of the order entitled "Turnover of Frozen Assets," in recognition that Sussman owned certain gold coins in a safe deposit box in the Bank of New York ("BNY") branch in Secaucus, New Jersey, the order stated:

> Bank of New York shall, within five (5) business days of receiving notice of this Order by any means . . . transfer to the FTC or its designated agent . . . 314 $20 gold coins, 55 1 oz. Austrian Philharmonic gold coins, and 65 1 oz. Krugerrand gold coins contained in safe deposit box number 025-0003383 located at Bank of New York, Branch #250, 1 Harmon Plaza, Secaucus, New Jersey.

App. at 691.

Four days later, on July 22, 2005, in a letter to the bank's legal process department, the FTC "request[ed] that the Bank of New York maintain the [Secaucus] safe deposit box as a frozen account until such time as [the FTC] provide[d] [the bank] with further instructions for the transfer of its contents to the FTC."[2]

---

[2] Due to the fluctuating price of gold, the FTC wanted to wait until the completion of the civil appellate process before liquidating the coins. Evidently it was concerned that if it liquidated them it might later need to return them after

5

App. at 722 (emphasis in original). Significantly, although Sussman appealed from the final order, he did not seek a stay of the order, and none ever was entered.

On September 6, 2007, we affirmed the district court's final order in the civil case. FTC v. Check Investors, Inc., 502 F.3d 159 (3d Cir. 2007). Sussman petitioned for rehearing but on February 6, 2008, we denied this petition. On the day that we denied Sussman's petition for rehearing, he emailed two of his attorneys and informed them that the Bergen County Sheriff's Office had seized the contents of a Bank of America safe deposit box ("BOA box") that he rented in Fort Lee, New Jersey, to enforce a default judgment against him obtained by a Texas creditor. Appellant's br. at 9-10. Like his Secaucus safe deposit box ("BNY box"), the Fort Lee BOA box was subject to the district court's freeze order in the underlying FTC civil action requiring that the bank turn over its contents to the FTC. According to one of his attorneys, Sussman "was agitated because he felt that the FTC had not protected his interest in the coins. . . . [H]e felt that he was in a race with the Texas creditor to get to the [BNY] box" inasmuch as the creditor in his view already had some control over the BOA box. App. at 361. Sussman's attorneys told him not to try to gain access to the BNY box.[3]

_____

reacquiring them at another price if Sussman was successful on an appeal from the judgment in the civil case. App. at 202.

[3] As of October 1, 2006, J.P. Morgan Chase Bank purchased the assets, deposits, and bank branches of the Bank of New York.

On February 7, 2008, a day after he advised Sussman not to enter the bank one of his attorneys, David Shapiro, spoke with Sussman and found his client still to be "agitated." Sussman continued to view the situation as "a race to the bank, a race to the box." According to Shapiro, Sussman "want[ed] to protect the coins because of his interest and the government's interest." App. at 365. Later that day, Sussman entered BNY's branch in Secaucus to gain access to his safe deposit box. But the BNY box had a sticker on it that said "refer to manager," and the bank file indicated that the box must "remain[] held and frozen indefinitely." Appellee's br. at 3. BNY personal banker Dora Texeira spoke with lead teller Emma Dos Santos, who informed her "that in the past it had been a problem with the box, and that Mr. Sussman could not have access." App. at 264. Texeira asked Sussman whether he had had any problems in the past with the box, and he responded: "Yes, I did, but my lawyers are taking care of it." App. at 265. Texeira understood his response to mean "that everything was okay now, that now he could have access to the box." App. at 265.

Texeira investigated the matter further but was unable to get a firm answer to the question of whether Sussman could have access to the BNY box. The bank's legal department left the final decision with respect to access to personnel at the branch, and Assistant Branch Manager Luna Williams decided to grant Sussman access. Appellant's br. at 9. Sussman took the box into a private room and emptied all of the gold coins into his briefcase. He then returned the empty box and left the bank

App. at 228. Nevertheless, for the sake of consistency, we will refer to the Secaucus bank as "BNY."

with the coins. Sussman later told his attorneys not to inform the government that he had removed the coins. App. at 374. In an email, Sussman wrote: "Quite a hall" [sic: haul], and "I think we should do absolutely nothing. Let the [creditor] in Texas enjoy his windfall as we will ours." App. at 378.

The bank subsequently realized that it had made a mistake when it allowed Sussman to have access to the box and, accordingly, contacted the FTC and advised it of what had happened. The FTC then initiated an investigation into the matter and notified the Postal Inspection Service about the missing coins. Postal Inspector Jeffrey DeFuria then obtained a search warrant for the box. He executed the warrant on April 14, 2008, at which time he discovered that Sussman had removed the coins. This discovery led the government to charge Sussman in a criminal complaint on May 12, 2008, with the theft of the coins and obstruction of justice. Notwithstanding the initiation of the criminal proceedings Sussman retained the coins for almost seven more months before returning them.

On October 2, 2008, at the request of Steven Lacheen, another one of Sussman's attorneys, the United States Attorney's Office convened a meeting with DeFuria and other representatives from the government. Lacheen informed the government's representatives that his client had control of the gold coins. Nearly six weeks later, on November 10, 2008, the United States Supreme Court denied Sussman's petition for a writ of certiorari in the underlying civil case. See Check Investors, Inc. v. FTC, 555 U.S. 1011, 129 S.Ct. 569 (2008). By denying Sussman's petition, the Court left standing the district

8

court's permanent injunction and final order entitling the FTC to judgment against Sussman and his co-defendants. Three days later, on November 13, 2008, the United States Attorney's Office sent a letter to Lacheen requesting that "the gold coins be returned to the government immediately." App. at 411. On December 2, 2008, Sussman complied with that request and returned the coins. App. at 412.

## III. JURISDICTION

The District Court exercised jurisdiction pursuant to 18 U.S.C. § 3231. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## IV. DISCUSSION

As we have indicated, the government initiated this criminal case on May 12, 2008, when it charged Sussman with theft of government property under 18 U.S.C. § 641 and obstruction of justice under 18 U.S.C. § 1503(a).

Under 18 U.S.C. § 641:

> Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of

another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or

Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted--

Shall be fined under this title or imprisoned not more than ten years, or both . . . .

Under 18 U.S.C. § 1503(a):

Whoever . . . corruptly, or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished . . . .

a. Insufficiency of the Evidence and Missing Transcripts

Sussman contends that the evidence at the trial did not support the jury's verdict against him. Specifically, he argues that the coins were not "money, or [a] thing of value of the United States" when he removed them from the BNY box, and, if anything, he only obstructed a non-judicial "voluntary

10

agreement" between the FTC and BNY. According to Sussman, the parties entered into that agreement when the FTC wrote to BNY requesting that the bank keep the coins in the BNY box as a frozen account until the FTC gave it further instructions.

The scope of our sufficiency of evidence review is familiar. "We review sufficiency-of-the-evidence challenges with particular deference to the jury's verdict." United States v. Kemp, 500 F.3d 257, 278 (3d Cir. 2007) (citation omitted). In conducting our "highly deferential" review, we view the evidence in the light most favorable to the government as the verdict winner and then determine whether any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. United States v. Helbling, 209 F.3d 226, 238 (3d Cir. 2000). In challenging the verdict on sufficiency of the evidence grounds, Sussman bears "a very heavy burden." United States v. Coyle, 63 F.3d 1239, 1243 (3d Cir. 1995).

In considering Sussman's sufficiency of the evidence argument, we recognize that although Sussman moved in the District Court under Federal Rule of Criminal Procedure 29 for a judgment of acquittal, he did not contend in his motion that the evidence was insufficient to support a guilty verdict on the theory that the coins were not money or a thing of value of the United States. Quite to the contrary, in his motion he conceded that "[t]he FTC had taken custody of the coins" and that "[t]hey undoubtedly belonged to the FTC at that point." App. at 339. Thus, it would be appropriate for us to hold that Sussman waived a sufficiency of the evidence argument on the money or

11

thing of value issue and that the waiver binds him on this appeal. See In re: Diet Drugs, No. 12-1180, ____ F.3d ____, ____, 2013 WL 310195, at *6 (3d Cir. Jan. 28, 2013); Tri-M Grp., LLC v. Sharp, 638 F.3d 406, 416 (3d Cir. 2011). But for the sake of thoroughness we will review his argument that the coins were not "money, or [a] thing of value of the United States" when he removed them on a plain error basis. See United States v. Vampire Nation, 451 F.3d 189, 203 (3d Cir. 2006).

We will find plain error if there is "(1) an error; (2) that is plain; and (3) that affected substantial rights." Id. In the event that Sussman meets all three conditions, we have the discretion to "grant relief, but only if the error seriously affects the fairness, integrity, or public reputation of [the] judicial proceedings." United States v. Dobson, 419 F.3d 231, 236 (3d Cir. 2005) (alteration in original) (internal quotation marks and citation omitted).

With respect to the Count Two obstruction of justice charge, Sussman argued in the District Court and has argued here that there was no court order that precluded him from removing the coins from the safe deposit box and that any restraints on him with respect to removing the coins were contained in a voluntary agreement between the FTC and the bank evidenced in the FTC's July 22, 2005 letter to BNY so that the obstruction of justice conviction must be reversed. We will review that argument under a sufficiency of the evidence standard.[4]

---

[4] In United States v. Knox, we noted that the Court of Appeals

12

Finally, to be successful with an argument that because a portion of the trial transcript is missing the case "warrant[s] reversal," Sussman must make "a specific showing of prejudice." United States v. Sierra, 981 F.2d 123, 125 (3d Cir. 1992) (citations omitted).

> 1. "[M]oney, or thing of value of the United States"

We are satisfied that there was sufficient evidence for the jury to find that the coins were "money or a thing of value of the United States" at the time that Sussman removed them from the BNY box.[5] On July 18, 2005, the district court granted the FTC's motion for summary judgment in the civil action and entered a "Final Order for Judgment and Permanent Injunction" that included the heading "Turnover of Frozen Assets," which

---

for the Tenth Circuit held that "the plain error test and the sufficiency of the evidence standard are essentially equivalent inquiries." 977 F.2d 815, 824 (3d Cir. 1992) (citing United States v. Bowie, 892 F.2d 1494, 1497 (10th Cir. 1990)), vacated on other grounds, 510 U.S. 939, 114 S.Ct. 375 (1993). As in Knox, "[w]e need not determine the precise boundaries of the plain error test since the government fulfilled the more stringent [sufficient evidence] standard" on both counts. Knox, 977 F.2d at 824.

[5] Arguably this question is legal in nature and is thus subject to plenary review. But even under that standard our result would not be different from that which we reach.

13

stated:

> 10. In order partially to satisfy the monetary judgment set forth in Section 5 of this Order, any financial . . . institution . . . that holds, controls or maintains accounts or assets of, on behalf of, or for the benefit of, any Defendant shall turn over such account or asset to the FTC within five (5) business days of receiving notice of this Order . . . . In particular:
>
> (a) Bank of New York shall, within five (5) business days of receiving notice of this Order by any means . . . transfer to the FTC or its designated agent (i) all assets held in account numbers . . . and (ii) 314 $20 gold coins, 55 1 oz. Austrian Philharmonic gold coins, and 65 1 oz. Krugerrand gold coins contained in safe deposit box number 025-0003383 located at Bank of New York, Branch #250, 1 Harmon Plaza, Secaucus, New Jersey . . . .

App. at 709-10.  The final order also provided that any funds or assets recovered by the FTC were to be deposited "into a fund administered by the FTC or its agent for equitable relief" to consumers injured by the defendants and that "[a]ny funds not used for such equitable relief shall be deposited to the U.S. Treasury as equitable disgorgment."  App. at 708.  Plainly, under this order the government's interest in the coins was a thing of value within 18 U.S.C. § 641 inasmuch as under the

14

order the government had an ownership interest in the coins or at least the right to possession or control over the coins. See United States v. Perez, 707 F.2d 359, 361 (8th Cir. 1983); United States v. Mitchell, 625 F.2d 158, 161-62 (7th Cir. 1980). Thus, it might be thought that this appeal is easily resolvable with respect to the money or thing of value question.

Yet notwithstanding the clear provisions in the final order and the precedents that we cite, Sussman contends that the "Final Order in the civil case gave the FTC at most a sort of lien (a right to levy) on Mr. Sussman's property, not 'ownership' of that property." Appellant's reply br. at 7. He then contends that the FTC failed to exercise that right as to the coins when it sent a letter to BNY asking the bank to make a direct wire transfer from certain designated accounts in the bank but also requested that it "maintain the safe deposit box as a frozen account" until the FTC instructed otherwise. App. at 722 (emphasis in original). Therefore, Sussman contends that the FTC did not take ownership of the box's contents and thus the gold coins were not "money, or thing of value of the United States" under 18 U.S.C. § 641 when he removed them. Furthermore, Sussman maintains that by asking BNY to maintain but freeze the BNY box, the FTC entered into a "voluntary arrangement" that was separate and distinct from the district court's final order and permanent injunction.[6] Thus, by Sussman's logic, even if we

---

[6] In "Defendant's Statement of the Evidence under FRAP 10(c)," in which Sussman attempted to reconstruct the trial record due to the missing transcripts, the July 22, 2005 FTC letter to BNY is described as "reflect[ing] a voluntary arrangement between the bank and FTC, under which the bank

conclude that the district court's order granted the FTC ownership of the coins for the purpose of invoking section 641, we should hold that the FTC abandoned that interest when it sent the letter asking the bank to maintain but freeze the box.

Sussman's argument, however, runs into the obvious problem that even under his theory the FTC could have retained an interest in the coins sufficient to satisfy the section 641 requirement by renting a separate safe deposit box in the Secaucus bank and moving the coins to that box. It is difficult to understand why the FTC's determination to allow the coins to remain in a frozen box with the intention that Sussman could not have access to that box rather than directly holding them at another location pending the outcome of the civil action should make any difference with respect to resolution of the ownership issue. But Sussman points to United States v. Scolnick, 392 F.2d 320, 322 (3d Cir. 1968), as support for his argument so we discuss that case. Scolnick was concerned with the seizure by the Internal Revenue Service ("IRS") of $100,000 in cash found in a safe deposit box to which the defendant-appellant Sidney Brooks in the criminal action apparently had access and the IRS's subsequent demand for $100,000 from Brooks in unpaid and due taxes. See id. The case was triggered when the Philadelphia police while searching for stolen jewelry following Brooks' arrest for the theft discovered the cash in the box when executing a search warrant. The police could not seize the cash pursuant to the search warrant issued in the stolen jewelry case, so they did not disturb the money in the box, but, instead,

will 'maintain the safe deposit box as a frozen account' . . . ." App. at 729.

16

reported their find to the IRS. The IRS served an administrative Notice of Termination of Tax Year on Brooks as well as a demand for $100,000 in unpaid and due taxes. The IRS then served a Notice of Levy, Notice of Federal Tax Lien and Notice of Seizure on the bank pursuant to 26 U.S.C. § 6331(a) which expressly applies to "any person liable to pay any tax [who] neglects or refuses to pay." 26 U.S.C. § 6331(a).

In what we characterized in our opinion as a "bizarre" scheme, Brooks and his co-defendants were able subsequently to enter the bank and "rescue" the safe deposit box and its contents even though as a result of the levy the box had been sealed. This rescue led to Brooks's indictment and conviction, inter alia, for rescuing the box and money contrary to 26 U.S.C. § 7212(b). Brooks appealed from his conviction but on the appeal we affirmed, pointing out that the levy effected a seizure of the property. Thus, Brooks unlawfully rescued property owned by the United States.

Sussman correctly factually distinguishes this case from Scolnick by pointing out that in Sussman's case, unlike in Scolnick, there had not been a levy on the safe deposit box. He thus contends that the basis for our holding in Scolnick that property of the United States had been rescued is missing here. But Scolnick is inapposite here, for when Sussman removed the coins there already was an outstanding court order freezing the safe deposit box and its contents whereas in Scolnick the levy was crucial for without it the IRS would not have had a claim on the contents of the box. Thus, the fact that "[w]hen validly invoked, [a levy] effects a seizure of the delinquent's property

17

tantamount to a transferal of ownership," United States v. Sullivan, 333 F.2d 100, 116 (3d Cir. 1964) (citation omitted), is immaterial in this case for the government was not required to rely on a levy in order to reach the contents of Sussman's safe deposit box.[7]

The government points to United States v. Milton, 8 F.3d 39 (D.C. Cir. 1993), as a case more germane than Scolnick as support for the money or thing of value aspect of the verdict. Unlike Scolnick, which involved a charge under a different statute than those involved in this case, Milton dealt with a prosecution under 18 U.S.C. § 641 for taking money or a thing of value of the United States. In Milton, the Equal Employment Opportunity Commission ("EEOC") settled an action with CW Transport Inc. ("CW") regarding employment discrimination. CW agreed to make an irrevocable $1 million payment to the EEOC, which would make the money available as back-pay awards to qualified claimants. John Milton, the EEOC attorney who was administering the settlement, deposited the CW's $1 million check with E.F. Hutton & Company in an account in his name and "such other person designated by the EEOC as EEOC Representative for Account Claimants in EEOC vs. CW

---

[7] Sussman also relies on In re Ashe, an inapposite decision, which was a consolidation of four bankruptcy appeals "involv[ing] the effect of section 522(f)(1) of the Bankruptcy Reform Act of 1978, 11 U.S.C. § 522(f)(1) (Supp. III 1979), on liens claimed by the Commonwealth National Bank on property of a debtor by virtue of confessions of judgment notes." In re Ashe, 712 F.2d 864, 865 (3d Cir. 1983).

Transport (Case 86C 680C)." Milton, 8 F.3d at 41. E.F. Hutton agreed to make payments from the account in accordance with Milton's written instructions. Milton took advantage of this arrangement to take a percentage of payments that E.F. Hutton made at his direction to persons scheming with him who made false claims on the fund. When charged under section 641 Milton contended that the money he took did not qualify as "money . . . of the United States" under that section.

Milton was convicted of a violation of section 641 and appealed, again advancing the argument that he did not take money of the United States. The court of appeals rejected his argument reasoning that CW relinquished the money it paid in settlement of the EEOC action and E.F. Hutton and Company served only as a repository for the funds. Though the money ultimately would belong to legitimate claimants, until they came forward, it belonged to the United States. The court agreed with the EEOC that supervision and control over the $1,000,000 was the test and that the EEOC exercised both over the E.F. Hutton deposit.[8] See Milton, 8 F.3d at 42; see also United States v. Benefield, 721 F.2d 128, 129 (4th Cir. 1983) ("In determining whether an interest qualifies as 'any . . . money, or thing of

---

[8] The court of appeals acknowledged that the EEOC's "'intent to maintain an ownership interest in these funds' [was] not reflected in a statute or regulation. . . . [I]t [was] enough that the settlement agreement and the arrangements with E.F. Hutton, rather than any statute or regulation, reflected the EEOC's complete supervision and control over the $1 million paid to the agency." Milton, 8 F.3d at 44 n.4 (internal citation omitted).

value of the United States' under 18 U.S.C. § 641, courts have identified as critical factors the basic philosophy of ownership reflected in relevant statutes and regulations and the supervision and control contemplated and manifested by the government." (citations omitted)).

The court of appeals rejected Milton's argument that two Supreme Court opinions, United States v. Johnston, 268 U.S. 220, 45 S.Ct. 496 (1925), and United States v. Mason, 218 U.S. 517, 31 S.Ct. 28 (1910), on which he relied (and on which Sussman now relies) were contrary to its result .[9] These cases dealt with the initial source and ultimate destination of stolen money.  See Milton, 8 F.3d at 42-43.

Rather than following those two cases, the court of appeals in support of its holding cited and followed its decision in Arbuckle v. United States, 146 F.2d 657 (D.C. Cir. 1944).  In Arbuckle, the manager of the United States Senate's restaurant was tasked with deposit of the receipts at the restaurant in a non-government bank.  The manager then could use those funds to cover the cost of food and expenses for the restaurant so far as the funds were sufficient for that purpose.  The manager, however, diverted some of the receipts to himself and thus was

---

[9]  See Milton, 8 F.3d at 42 (discussing Johnston, 268 U.S. 220, 45 S.Ct. 496 (considering whether a person collecting admission fees to a sporting event is guilty of embezzlement when he does not remit to the government taxes due on the fees), and Mason, 218 U.S. 517, 31 S.Ct. 28 (dealing with a charge of embezzlement of money paid to a clerk of court)).

indicted and convicted for embezzlement of money or property of the United States. On appeal from the conviction the court of appeals used a supervision and control test to uphold the manager's conviction. See Arbuckle, 146 F.2d at 659.

Here, BNY was in a position like E.F. Hutton in Milton in that it functioned as the repository of the coins just as E.F. Hutton was the repository of the money in Milton. And, like the EEOC in Milton, the FTC retained supervision and control of the asset when it decided to hold the coins by leaving them in the BNY box. We recognize that the EEOC deposited the $1,000,000 in an account in its name, but here the FTC was in a similar position because it had a court-ordered monetary judgment in its name, enforceable against any and all of Sussman's assets, including those held by financial institutions and it exercised dominion over the coins when it asked BNY to freeze the box and thereby hold its contents. App. at 689-90.

Arguing in the alternative, Sussman cites United States v. Zwick, 199 F.3d 672 (3d Cir. 1999), abrogated by Sabri v. United States, 541 U.S. 600, 124 S.Ct. 1941 (2004), for the contention that even if the coins belonged to the United States at the time of the final order, they lost their status as government property when the FTC sent its July 22, 2005 letter to BNY. We reject this argument for we cannot conceive that the government intended to give up any interest that it might have had in the coins when it asked the bank to act as custodian for the contents of the box by freezing the box. Indeed, the government obviously had the exact opposite intent as it sent the freeze letter to safeguard the government's interest in the coins. Moreover,

even if we made an objective rather than subjective intent analysis, after writing the letter the FTC retained such control over the coins that it cannot be said that it abandoned any interest that it had in them. We also point out that Zwick involved an interpretation of 18 U.S.C. § 666, a statute that deals with "theft or bribery concerning programs receiving [f]ederal funds," a provision that Congress enacted in part to make up for the shortcomings of 18 U.S.C. § 641, under which "the federal government could prosecute only when it could establish that the stolen property was property of the United States." Zwick, 199 F.3d at 684. Yet such a prosecution "often was impossible if title had passed before the property was stolen or when federal funds were so commingled with non-federal funds that the federal character of those funds could not be shown." Id. As a result, Congress passed 18 U.S.C. § 666 in order to address theft, fraud, and bribery involving federal funds disbursed to private organizations or state and local governments under a federal program. See United States v. Cicco, 938 F.2d 441, 445 (3d Cir. 1991) (finding that 18 U.S.C. § 666 was passed in part to address such actions after title had passed to the recipient).[10]

---

[10] Sussman also cites to United States v. Stuart, 22 F.3d 76, 80 (3d Cir. 1994), which involved the theft of United States savings bonds. In Stuart, we addressed the issuance of substitute bonds in the event of theft and agreed with other courts of appeals which had held "[i]n two cases dealing with the retention and conversion of savings bonds that had been replaced by the government . . . that the bonds become the property of the United States." Stuart, 22 F.3d at 80 (citations omitted). Here,

In any event, the Supreme Court abrogated <u>Zwick</u> by extending section 666's reach through the elimination of a nexus requirement between criminal activity and federal funds. <u>Sabri</u>, 541 U.S. 600, 124 S.Ct. 1941. Regardless of section 666's reach, the common factual scenarios in prosecutions under that section involve private employees and local and state officials who steal money from organizations that have received federal funding. Here, the FTC's letter to BNY did not transfer title, nor were the coins commingled with other funds or property within the bank's possession. It is not as if the FTC gave the coins to BNY as a federal grant for its own operational benefit.[11]

2. "[T]he due administration of justice"

There was sufficient evidence for the jury to find that

---

we are not dealing with facts remotely resembling the issuance and substitution of United States savings bonds.

[11] In addition to rejecting for reasons that we explain below Sussman's premise that the FTC's July 22, 2005 letter to BNY constituted a voluntary agreement that superseded the district court's final order, we note that when the FTC wrote the letter it acted consistently with the final order by designating BNY as its agent as the order stated: "(a) Bank of New York shall, within five (5) business days of receiving notice of this Order by any means, including but not limited to via facsimile, transfer to the FTC <u>or its designated agent</u> . . . ." App. at 710 (emphasis added).

23

Sussman interfered with "the due administration of justice" when he removed the gold coins from the BNY box and retained them for nearly ten months before returning them to the government. Under 18 U.S.C. § 1503(a), the elements of a prima facie case of obstruction of justice are:

> (1) the existence of a judicial proceeding; (2) knowledge or notice of the pending proceeding; (3) acting corruptly with the intent of influencing, obstructing, or impeding the proceeding in the due administration of justice; and (4) the action had the 'natural and probable effect' of interfering with the due administration of justice.

In re Impounded, 241 F.3d 308, 317 n.8 (3d Cir. 2001) (citing United States v. Collis, 128 F.3d 313, 318 (6th Cir. 1997)). On appeal, Sussman specifically takes issue with whether the evidence was sufficient to prove elements (1) and (4).[12] According to Sussman if he interfered with anything it was only with a "voluntary agreement" between the FTC and BNY established when the FTC sent its July 22, 2005 letter to BNY's

---

[12] Sussman always has maintained with respect to the second obstruction of justice element that he was holding the coins for safekeeping until the completion of the appellate process in the civil case. If "[t]he government won, the coins were going to the government. The coins, not any substitutes, but the actual coins. And if he won, he would be entitled to keep [them]." App. at 374.

legal department asking the bank to maintain the box as a frozen account. He then contends that the agreement does not qualify as a "judicial proceeding" under 18 U.S.C. § 1503(a) and thus he could not have violated that section.[13] App. at 721-22. Ironically Sussman's attempt to recharacterize the letter as an agreement rather than as a proceeding demonstrates that his argument with respect to element (4) of an obstruction offense is not meritorious. After all, either he interfered with a judicial proceeding in the form of a binding final order from the district court by removing the coins necessary for satisfying the monetary judgment against him, or he interfered with the "voluntary agreement" by removing the coins from the BNY box. Under either scenario, the "natural and probable effect" of his interference cannot reasonably be disputed. Therefore, the only substantial obstruction issue is whether Sussman interfered with a "judicial proceeding" within the meaning of 18 U.S.C. § 1503(a).

Sussman largely relies on a distinguishable opinion, United States v. Davis, 183 F.3d 231 (3d Cir. 1999), in support

---

[13] Sussman tries to make an issue by contending that the "voluntary agreement" referred back to the terms and conditions of the district court's preliminary injunction, which ordered all financial institutions to retain the defendants' assets. In fact, however, the so-called "voluntary agreement" clearly was carrying out the terms of the final judgment. In any event, there would be no legal significance to Sussman's contention even if true, because as Sussman notes, the preliminary injunction was superseded by the final order, which was in effect when he removed the coins from the BNY box.

25

of his obstruction of justice argument. In <u>Davis</u> the United States Customs Service was seeking to infiltrate a mob crew through the use of an informant in hopes of building a criminal case and later bringing charges. In the course of our opinion on an appeal from an obstruction of justice conviction arising from the infiltration we held that a wiretap instituted as part of the investigation did not qualify as a "pending judicial proceeding" under 18 U.S.C. § 1503. We reasoned that a wiretap is generally part of an investigation being carried out by members of the executive—not judicial—branch, even if a district court actively is monitoring the procedure. <u>See</u> <u>Davis</u>, 183 F.3d at 239 ("[A]n investigation <u>simpliciter</u> is not enough to trigger § 1503." (emphasis in original)). As support for that result, we pointed to other cases dealing with defendants' acts of "intentionally interfering with the execution of a search warrant by warning its target to conceal or dispose of evidence" or obstructing an "[i]nvestigation by agents of the Treasury Department 'or some other like instrumentality' of the United States"[14] that did not come within section 1503. <u>Id.</u> (citations omitted); <u>see</u> <u>also</u> <u>United States v. Simmons</u>, 591 F.2d 206, 208 (3d Cir. 1979)

---

[14] <u>See</u> <u>also</u> <u>United States v. Brenson</u>, 104 F.3d 1267, 1280 (11th Cir. 1997) ("While it is clear that a grand jury proceeding is a recognized part of the judicial proceedings that can be impeded or obstructed, it is not the only part of the judicial proceeding that is protected by § 1503 from impediments, improper influence or obstruction. Section 1503 employs the term 'due administration of justice' to provide a protective cloak over <u>all</u> judicial proceedings, <u>irrespective of at what stage in the judicial process the improper activity occurs</u>." (emphasis added)).

("[T]he obstruction of an investigation that is being conducted by the FBI, or by any similar governmental agency or instrumentality, does not constitute a [section] 1503 violation because such agencies or instrumentalities are not judicial arms of the government 'administering justice.'" (footnote omitted)).[15]

Davis and Simmons, however, differ from this case as this case does not concern "some ancillary proceeding," distinct from a judicial proceeding "such as an investigation independent of the court's . . . authority."' Davis, 183 F.3d at 241 (citing United States v. Aguilar, 515 U.S. 593, 599, 115 S.Ct. 2357, 2362 (1995)). Rather, in this case BNY was maintaining the BNY box as a frozen account and thus effectively was holding the coins pursuant to a direct court order. The reality is that Sussman is attempting to transform a final judicial order from the district court into a non-judicial, voluntary agreement between the FTC, an agency within the executive branch of the government, and BNY, a private financial institution, so that somehow the FTC rather than seeking to enforce the court's

---

[15] Applying 18 U.S.C. § 1503 broadly in the grand jury context, we explained in United States v. Simmons that "Section 1503 is a contempt statute. It was enacted as the counterpart to 18 U.S.C. § 401, whose reach is limited to conduct occurring in the presence of the court. As such, § 1503 allows punishment of actions taken with the specific intent to impede the administration of justice. So long as a defendant has such specific intent, he may not circumvent the court's contempt power by pressing 'empty technicalities.'" Simmons, 591 F.2d at 209-10 (footnotes omitted).

order substituted a voluntary agreement for that order. But we reject that argument because without the court order BNY and the FTC would not have had the authority to enter into an agreement freezing Sussman's assets. Moreover, we are not dealing with either an independent FTC investigation or an ongoing investigation supervised by the judiciary for when the FTC asked the bank to freeze the box by writing its July 22, 2005 letter, it was carrying out a direct order from the district court.

In reaching our result we have considered United States v. Cohen, 301 F.3d 152 (3d Cir. 2002), a case in which a Secret Service agent stole money seized during the course of two investigations. In both instances, the agent stole the money following the seizure of property belonging to suspects. In the first case, the target was arrested and the Service seized numerous items from his residence. In the second case, the target was suspected of counterfeiting, and the Service executed search warrants at his residence and storage locker. The latter case was at such a preliminary stage that the district court granted the agent's motion for judgment of acquittal at the close of the government's case, a disposition with which we were not concerned on the appeal. In the former case we held that there was insufficient evidence to convict the agent under 18 U.S.C. § 1503 for the government failed to "point[] to a shred of evidence showing that the money that was found in the envelope and that the [agent] misappropriated had any connection whatsoever to any charges that were investigated or considered in the [target's] matter." Cohen, 301 F.3d at 157. But Sussman's case is different for the final court order and injunction explicitly

28

provided for the gold coins to be delivered to the FTC, whereas the money in question in Cohen was nothing more than cash seized from a suspect's residence that he had obtained from an undetermined source.

Sussman makes the blanket assertion "that the processes authorized by law for the collection of a judgment by a winning party are not 'judicial proceedings' within the meaning of the case law under 18 U.S.C. § 1503," appellant's reply br. at 3, and goes so far as to say that "[t]he government does not deny" that assertion, id., but he does not offer support for this contention. The government, of course, does deny that assertion and points to a decision by the United States Court of Appeals for the Eighth Circuit in which the court affirmed the application of 18 U.S.C. § 1503 to defendants who tried to hide assets to prevent the government from collecting a fine and restitution payments stemming from one of the defendant's conviction. See United States v. Frank, 354 F.3d 910, 918 (8th Cir. 2004) (affirming "a second count of obstructing justice in violation of § 1503 for moving, concealing, and refusing to advise law enforcement agents of the location of a Chrysler LeBaron . . . with the knowledge that a court order had been issued to seize the vehicle").

Moreover, in United States v. Walasek we cited approvingly to United States v. Solow in which the court held that the section 1503 omnibus provision "is all-embracing and designed to meet any corrupt conduct in an endeavor to obstruct or interfere with the due administration of justice." United States v. Walasek, 527 F.2d 676, 681 (3d Cir. 1975) (quoting

29

United States v. Solow, 138 F. Supp. 812, 814 (S.D.N.Y. 1956). Overall we reject Sussman's obstruction of justice contentions.

### 3. Missing Transcripts

Alternatively, Sussman argues that if we do not reverse his convictions on the merits he is entitled to a new trial due to missing trial transcripts. Under the Court Reporter Act, "[e]ach session of the court . . . shall be recorded verbatim," including "all proceedings in criminal cases had in open court." 28 U.S.C. § 753(b). Yet here there are no transcripts of the testimony of government witness Doreen Madonia, a BNY vice president, or of the cross-examination and redirect testimony of government witness Gregory Ashe, an FTC attorney involved in the civil case. App. at 725. To qualify for a new trial, however, Sussman must make "a specific showing of prejudice" from the absence of the transcripts to "warrant reversal." United States v. Sierra, 981 F.2d 123, 125 (3d Cir. 1992) (citations omitted).[16] In this regard, we have "recognized a defendant's request for a complete transcript only when the defendant has shown a

---

[16] In Sierra we also noted that "the absence or presence of the same counsel on appeal is but 'one significant factor' to consider in determining prejudice" when there is a missing transcript. 981 F.2d at 126 (citing United States v. Antoine, 906 F.2d 1379, 1381 (9th Cir. 1990)). But the circumstance that Sussman had different counsel at the trial and on the appeal is not dispositive as we surely cannot hold that a convicted defendant automatically is entitled to a reversal of his conviction on appeal if a transcript of portions of his trial is missing.

'colorable need' for the transcript." Fahy v. Horn, 516 F.3d 169, 190 (3d Cir. 2008) (citing Karabin v. Petsock, 758 F.2d 966, 969 (3d Cir. 1985)) (denying criminal defendant's request for reconstruction of 25-year-old record of voir dire proceeding in a trial in which he was convicted and sentenced to death due to defendant's failure to provide "concrete claims of error").

Federal Rule of Appellate Procedure 10(c) sets forth the procedure to follow when transcripts are missing:

> If the transcript of a hearing or trial is unavailable, the appellant may prepare a statement of the evidence or proceedings from the best available means, including the appellant's recollection. The statement must be served on the appellee, who may serve objections or proposed amendments within 14 days after being served. The statement and any objections or proposed amendments must then be submitted to the district court for settlement and approval. As settled and approved, the statement must be included by the district clerk in the record on appeal.

This procedure can be satisfactory for "[o]ften, the reconstructed record will enable the appellate court effectively to review the relevant issues." Sierra, 981 F.2d at 126 (citations omitted).

In this case to address the problem of the missing transcripts, the parties followed the Rule 10(c) procedure with the District Court involved in the process. App. at 725-26. The

31

Court noted that its "recollection of Mr. Ashe's [the FTC attorney] testimony [was] not detailed," but it "reviewed [the] trial notes of [Ashe's] cross-examination and they contain no inconsistencies with the summary of the cross-examination as set forth in Mr. Goldberger's [Sussman's appellate counsel] submission filed November 15, 2011." App. at 725. The Court added: "The government's objections to Mr. Goldberger's account do not appear to be a material correction."[17] App. at 725. The Court only had trial notes of Madonia's direct testimony, but the notes were consistent with Sussman's submission, "supporting a conclusion that his summary is accurate." App. at 725-26.

We note that Sussman contends that a transcript of Ashe's re-redirect testimony is missing but there is some dispute as to whether Ashe even was questioned on a final re-redirect examination in the District Court. Sussman's own supplemental submission to the District Court to complete the missing record indicated:

> As with re-cross-examination, neither the bench notes nor defense notes refer to re-re-direct as

---

[17] The government offered two corrections, but the only question was whether the FTC designated the bank as an agent to keep and maintain the FTC's assets. App. at 733. Sussman denies that Ashe testified to that fact. Of course, the legal effect of the letter is plain on its face when considered in the context in which it was written and it is difficult to understand how Ashe's testimony was needed on that point.

having occurred. The prosecutor's notes show testimony on re-re-direct concerning Govt Exh. G-109 (letter to Shelby Feder in [Bank of New York's] legal department). It is not possible to reconstruct most of the testimony on re-re-direct, as the prosecutor's notes say only: 'G-109 letter to Shelby Feder Within 5 Days of Final Order - .'

App. at 738. Sussman tries to exploit this seemingly contrived ambiguity:

Again, this discussion, the substance of which does not appear in any of the notes, would appear to be directly pertinent and potentially important in terms of Mr. Sussman's possible argument on whether the contents of the safety deposit box constituted a 'thing of value' or property 'of the United States' at the pertinent time.

App. at 738 n.4. Yet the reconstructed transcript reveals that Sussman had the opportunity to cross-examine Ashe on Government Exhibit G-109. App. at 729. Moreover, based on our intensive study of this case we cannot conceive of anything that Ashe could have said during re-redirect testimony that would have had an impact on the determination of "the money or thing of value" issue.

Sussman cannot successfully manufacture his own disputes, attribute legal significance to them, and then claim that they only can be resolved by an examination of testimony that is

33

unavailable because the transcript of the testimony is missing, particularly because the missing transcripts already have been summarized and submitted through court-supervised reconstruction. The circumstances supporting Sussman's claim that he has been prejudiced fall far short of those in cases to which he cites, including Simmons v. Beyer, 44 F.3d 1160 (3d Cir. 1995), a Batson habeas corpus jury selection case. In Simmons v. Beyer, no one could remember how many potential African American jurors had been peremptorily challenged and the assistant prosecutor from the trial had no recollection or notes of why he struck individual venirepersons. Id. at 1168. Thus, in Simmons v. Beyer we were confronted with a case involving a missing record dealing with a significant constitutional issue in a situation in which there was no hope of reconstructing the record. See id. We simply could not review the Batson claim without knowing "whether Simmons' jury selection process was infected by racial discrimination." Id.

The Simmons v. Beyer situation is completely inapposite here for in this case, unlike in Simmons v. Beyer, "the reconstructed record [has] enable[d us] effectively to review the relevant issues." Sierra, 981 F.2d at 126 (citations omitted). Here, Sussman does not raise a colorable claim because he fails to make a specific showing of prejudice attributable to the absence of the transcripts. Therefore, the circumstance that there are missing transcripts does not entitle him to a new trial.

b. Redaction

In the District Court in a pretrial motion Sussman sought

34

to prevent the introduction of evidence from the civil suit that he claimed unfairly would prejudice his defense, in particular the temporary restraining order, preliminary injunction and final judgment. Sussman argued that under Federal Rules of Evidence 403 and 404(b), a stipulation with respect to the civil action would be sufficient for the government to prove the existence of that proceeding so far as necessary in this criminal action and that there was no need to introduce these three documents from the civil case into evidence in this criminal case. Although there was a stipulation in the criminal case with respect to certain aspects of the civil case, these three documents and certain other redacted documents from the civil case were admitted into evidence in the criminal case. App. at 45.

Under Fed. R. Evid. 403 (emphasis added):

The court may exclude relevant evidence if its probative value is <u>substantially</u> outweighed by a danger of one or more of the following: <u>unfair prejudice</u>, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.[18]

---

[18] We held in <u>United States v. Cross</u> that Rule 403 "creates a presumption of admissibility." 308 F.3d 308, 323 (3d Cir. 2002) (citation omitted). The "[e]vidence cannot be excluded under Rule 403 merely because its unfairly prejudicial effect is greater than its probative value. Rather, evidence can be kept out only if its unfairly prejudicial effect 'substantially outweigh[s]' its probative value." <u>Id.</u> (alteration in original) (citing Fed. R. Evid.

Under Fed. R. Evid. 404(b)(1):

> Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

The District Court ruled that the documents were critical evidence regarding the crucial factor in the case of Sussman's intent when he removed the coins from the BNY box and that a stipulation would be an insufficient substitute because the documents potentially spoke to Sussman's motivation in accessing the safe deposit box. App. at 180. With Rules 403 and 404(b) in mind, the parties worked together under the Court's supervision to redact the documents before moving them into evidence.[19] Sussman, however, preserved his

---

403).

[19] The government's first witness at the criminal trial was FTC attorney Gregory Ashe. At the beginning of the direct examination, the Court told the jury:

> What we're trying to do is we're not trying the civil case here. We want to stay totally away from it and involve ourselves in the charges in this case. We have to know what the procedure was, and we have to know what the background of the documents from which you will decide the case is. But we just want to get into the—we

objection to their admission and the Court's denial of the use of his proposed stipulation that he contended would have obviated the need for admission of the documents even as redacted.

"We review a district court's decision to admit or exclude

don't want to get into the details of the civil case.

App. at 169.

The government then read the jury the following stipulation regarding the FTC's civil action:

> In May of 2003, the Federal Trade Commission, or FTC, filed a civil lawsuit against Barry Sussman, the defendant in this case, along with two other individuals. We're going to call this the FTC action for the remainder of this action. On July 18th, 2005, the FTC won the FTC action, and Mr. Sussman and the others were ordered the [sic] [to] pay about 10.2 million dollars. The substance is not before you, as the Judge just said. You may see that several documents or exhibits that we will look at over the course of the next few days have been redacted or marked with blank [sic] [black] ink in certain parts, and please do not pay any attention to those parts. Please just focus on what you can actually see and read.

App. at 170.

evidence for abuse of discretion, and such discretion is construed especially broadly in the context of Rule 403." United States v. Mathis, 264 F.3d 321, 326-27 (3d Cir. 2001) (citation omitted).[20]  Sussman argues that the District Court abused its discretion when it allowed admission of the documents because, even as redacted, indeed particularly as redacted, they were prejudicial.  According to Sussman, "the extensive redaction itself was highly prejudicial in its own way." Appellant's br. at 31.  He contends that he was especially prejudiced "where the government also presented witness testimony concerning the FTC civil action."  Appellant's br. at 31 (emphasis added).

Sussman supports his argument by citing to Old Chief v. United States for the proposition that a court considering a defendant's offer to stipulate should "take account of the full evidentiary context of the case as the court understands it when the ruling must be made."  519 U.S. 172, 182, 117 S.Ct. 644, 651 (1997) (footnote omitted).  Under Old Chief, a trial court should not view the disputed evidence in isolation but rather should consider the range of evidentiary alternatives available to it.  See id. at 182-84, 117 S.Ct. at 651-52.  Yet the Old Chief Court explicitly restricted its holding "to cases involving proof of felon status."  Id. at 183 n.7, 117 S.Ct. at 651 n.7.  The Court added that the abuse of discretion standard "is not satisfied by a

---

[20] We recognize that sometimes we exercise plenary review on admission of evidence questions involving construction of the Federal Rules of Evidence, but we are not concerned with such a question here.  United States v. Johnson, 388 F.3d 96, 100 (3d Cir. 2004).

mere showing of some alternative means of proof that the prosecution in its broad discretion chose not to rely upon." Id. Here, the prosecution simply chose not to rely exclusively on Sussman's proposed stipulation, which significantly did not include a stipulation as to his intent when he removed the coins from the BNY box. Sussman's creative application of Old Chief attempts to extend that case's holding to an unacceptable extent.

Sussman also undercuts his argument with the assertion that the disputed evidence concerned a "consequential fact," rather than "an element of the crime charged" and therefore is particularly suitable for a stipulation. See United States v. Higdon, 638 F.3d 233, 243 (3d Cir. 2011). In Higdon we drew an evidentiary distinction between "elements" and "facts" and concluded that a prior conviction was "an element of the crime charged" in a case charging a convicted felon with possession of a firearm. Consequently, we held that the district court erred when it did not permit a stipulation with respect to the defendant's prior conviction to be admitted into evidence because to obtain a conviction the government had to prove all of the elements of the charged offense. Id. (emphasis in original).

In our case in its instructions to the jury, the District Court appropriately informed the jury that the third element of the Count One charge, theft of government property, was "that the Defendant did so knowingly with the intent to deprive the United States . . . ." Supplemental app. at 18 (emphasis added). The Court explained: "To act knowingly means to act

39

intentionally and voluntarily with an awareness of what was happening, and not because of ignorance, mistake, accident or carelessness. Whether the Defendant acted knowingly may be proven by the Defendant's conduct and by all of the circumstances surrounding the case." Id. at 22. The second element of the Count Two charge, obstruction of justice, also included a "knowledge" requirement, and the third element required the government to prove beyond a reasonable doubt that Sussman intended to influence a pending judicial proceeding. The temporary restraining order, preliminary injunction and final order inevitably assisted the jury when it considered Sussman's intent in removing the coins because they set forth the situation that he faced with respect to control of the coins and made clear the benefit he could hope to obtain by gaining possession of them.[21] Consequently, the District Court did not abuse its discretion by allowing the redacted documents to be admitted into evidence and used by the jury during deliberations rather than confining the reference to them to a stipulation of their existence.

In his reply brief, Sussman attempts to bolster his redaction argument with a litany of criminal cases in which the prejudicial evidence introduced was far more damaging than the evidence to which he objects here. See, e.g., Gray v. Maryland, 523 U.S. 185, 197, 118 S.Ct. 1151, 1157 (1998) (applying the joint trial Bruton prohibition on the introduction of a non-testifying co-defendant's confession naming the other defendant

---

[21] "Knowledge" and "intent" are also both exceptions under Federal Rule of Evidence 404(b) permitting the use of the defendant's prior "Crimes, Wrongs, or Other Acts."

to redacted confessions in which the defendant's name is replaced by an obvious indicator of him); United States v. Hardwick, 544 F.3d 565, 573 (3d Cir. 2008) (holding that the district court erred in admitting a co-defendant's redacted proffer statements that clearly identified the only two co-defendants charged with murder as the ones who pulled the trigger);[22] United States v. Murray, 103 F.3d 310, 319 (3d Cir. 1997) ("[E]vidence in a murder trial that the defendant committed another prior murder poses a high risk of unfair prejudice."). But in all of these cases the prejudicial evidence was far more damaging to the defendant than the disputed evidence admitted here and thus all are of limited utility in our analysis.

c. Jury Instructions

Sussman challenges two aspects of the instructions that the District Court gave the jury in both written and oral form that in some respects were inconsistent. First, he argues that the District Court incorrectly instructed the jury on the Count Two charge of obstruction of justice. Sussman, however, did not preserve an objection to that instruction so we review the

---

[22] In spite of the district court's error in Hardwick, we affirmed the defendant's conviction due to "[t]he overwhelming evidence convince[ing] us that the District Court's error was harmless beyond a reasonable doubt." Hardwick, 544 F.3d at 574 (citation omitted). In view of our conclusion that the District Court did not err in resolving the redaction issue we do not make a harmless error analysis on this appeal on this point.

41

challenge to it for plain error.  See United States v. Lee, 612 F.3d 170, 191 (3d Cir. 2010).  Second, he contends that the Court erred in substituting its abbreviated version of his "theory of defense" instruction for his more comprehensive version of that instruction.  In most instances, "[w]e review the refusal to give a particular instruction or the wording of instructions for abuse of discretion." United States v. Jimenez, 513 F.3d 62, 74 (3d Cir. 2008) (quoting United States v. Leahy, 445 F.3d 634, 642 (3d Cir. 2006)(internal quotation marks omitted)).  In conducting such a review, "we consider the totality of the instructions and not a particular sentence or paragraph in isolation."  Id. at 74-75 (internal quotation marks omitted).  However, we review de novo a district court's refusal to give a jury instruction on a defendant's "theory of defense" when the defendant objected at the trial to the court's refusal to give the instruction.  See United States v. Stewart, 185 F.3d 112, 124 (3d Cir. 1999) (citation omitted).

## 1. Obstruction of Justice

Sussman challenges the instruction that the District Court gave on the Count Two charge of "Obstruction of Justice" under 18 U.S.C. § 1503(a).  The statute provides, in pertinent part: "Whoever corruptly . . . endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished . . . ." 18 U.S.C. § 1503(a).  This is the statute's "Omnibus Clause," which functions as a catchall provision, and "is far more general in scope than the earlier clauses of the statute" covering grand jurors and court officers. United States v. Aguilar, 515 U.S. 593, 598, 115 S.Ct. 2357, 2362 (1995).  At trial, Sussman did

42

not object to the Court's obstruction of justice instructions, so we review the charge for plain error. See Lee, 612 F.3d at 191. "A 'plain error' is one that affects substantial rights," and "[a]n error affects 'substantial rights' if it was prejudicial in that it affected the outcome of the District Court proceedings." United States v. Ozcelik, 527 F.3d 88, 96 (3d Cir. 2008) (internal quotation marks and citations omitted); see also United States v. Dalfonso, 707 F.2d 757, 760 (3d Cir. 1983) (holding that "the error must be egregious or otherwise constitute a manifest miscarriage of justice" (citation omitted)). The defendant bears the burden of "establish[ing] that the error prejudiced the jury's verdict." Ozcelik, 527 F.3d at 96 (citation omitted). Even "[i]f the defendant satisfies this showing, we may, but are not required to, order correction." United States v. Tyson, 653 F.3d 192, 211 (3d Cir. 2011) (citation omitted).

Sussman challenges the District Court's jury instructions on the likely effect of his action in removing the coins on a pending judicial proceeding and his knowledge of that effect. More specifically, Sussman contends that the Court failed to inform the jury that under Aguilar to convict him on Count Two it would have to find that he "knew that his actions were likely to affect the judicial proceedings" and that "it had to find that the natural and probable effect of the endeavor would actually be to interfere with the due administration of justice." Appellant's br. at 40-41 (emphasis in original).

In support of his argument with respect to the jury instructions Sussman provides the following excerpt from the District Court's instructions on the second and third elements of

43

the obstruction of justice offense charged in Count Two:

> The second element the government must prove beyond a reasonable doubt is the defendant's knowledge of an official pending proceeding. This element requires that the defendant knew that such proceeding was pending on February 7th, 2008.[23]  In this regard, you may take into account all the facts and circumstances surrounding the conduct from which the defendant is charged in determining whether he knew or had a reasonable basis for believing that the proceedings was pending. Third and final element that the government must prove is that the defendant obstructed justice.  To satisfy this element, the government must prove beyond a reasonable doubt that the defendant corruptly endeavored to influence, obstruct or impede the due administration of justice with the intent to influence the pending judicial proceeding.
>
> . . .
>
> The word 'endeavor' means any effort or act, however contrived, to obstruct or interfere with the pending judicial proceeding.  Success of the endeavor is not required to find the defendant guilty.

---

[23] Sussman removed the coins from the BNY box on February 7, 2008.

App. at 543-44.

As the government points out, Sussman supplies the above section of the jury instructions without acknowledging that before giving the specific instructions that we have quoted the District Court charged the jury that the government had to prove beyond a reasonable doubt "that the defendant's act was done corruptly; that is, that the defendant acted knowingly and dishonestly with the specific intent to impede the proceeding in its due administration of justice." App. at 541-42.

Sussman quotes from our In re Impounded decision, in which we noted in a footnote:

The elements of a prima facie case of obstruction of justice under 18 U.S.C. § 1503 are: (1) the existence of a judicial proceeding; (2) knowledge or notice of the pending proceeding; (3) acting corruptly with the intent of influencing, obstructing, or impeding the proceeding in the due administration of justice; and (4) the action had the 'natural and probable effect' of interfering with the due administration of justice.

241 F.3d at 317 n.8. But Sussman overlooks the footnote's citation to United States v. Collis, 128 F.3d 313, 318 (6th Cir. 1997), in which the Court of Appeals for the Sixth Circuit held:

In order to satisfy § 1503, the government must prove that (1) there was a judicial proceeding; (2) the defendant had knowledge or notice of the

45

pending proceeding; and (3) the defendant acted corruptly with the intent of influencing, obstructing, or impeding the proceeding in the due administration of justice.

Id. (footnote omitted) (citations omitted). The Collis court was referring to Aguilar, in which the Court explained the third element was "a 'nexus' requirement—that the act must have a relationship in time, causation or logic with the judicial proceedings. In other words, the endeavor must have the 'natural and probable effect' of interfering with the due administration of justice." Aguilar, 515 U.S. at 599, 115 S.Ct. at 2362 (internal quotation marks omitted). The District Court did not have to list the "nexus" requirement as a fourth element, and it adequately covered the requirement when it gave the following instructions that followed Sussman's selected excerpt:

Often that state of mind with which a person acts at any given time cannot be proved directly because the defendant's state of mind can be proved indirectly from the surrounding circumstances. One cannot read another person's mind or tell what he or she is thinking. Thus, to determine a defendant's state of mind or what the defendant intended or knew at a particular time, you may consider evidence about what the defendant said, what the defendant did or failed to do, and how the defendant acted, and all the other facts and circumstances shown by the evidence

46

that may prove what was in the defendant's mind at that time. It is entirely up to you to decide what the evidence presented during this trial proves or fails to prove about the defendant's state of mind.

You may also consider the natural and probable results or consequences of any acts that the defendant knowingly did, and whether it is reasonable to conclude that the defendant intended those results or consequences. You may find that you are not required to find that the defendant knew and intended the natural and probable consequences as a result of acts he knowingly did. This means that if you find that an ordinary person in the defendant's situation would have naturally realized that certain consequences would result from his actions, then you may find, but you are not required to find that the defendant did know, and did intend those consequences would result from his actions. This is entirely up to you to decide as finders of the facts in this case.

App. at 544-45.

The District Court specifically instructed the jury on how to assess Sussman's state of mind, including the consideration of the likely effect of his actions. The "knowledge" requirement with which Sussman takes issue actually refers to the knowledge of a pending judicial proceeding, whereas "corruptly" defines

47

the mens rea for the "likely to affect" component of the obstruction. In his reply brief, Sussman withdrew his challenge to the jury instruction on the mens rea element of "corruptly." Appellant's reply br. at 15 n.12. Sussman, moreover, twists the "natural and probable effect" requirement beyond recognition when he argues that the jury had to find that "the natural and probable effect of the endeavor would actually be to interfere with the due administration of justice." Appellant's br. at 41 (emphasis in original). Under Aguilar the emphasis is on the likely, not actual, impact of the defendant's disputed actions. Therefore, we do not find that the District Court committed error, let alone plain error, in its charge to the jury.[24]

## 2. The Theory of Defense Instruction

We have "established that [a] defendant is entitled to a theory of defense instruction if (1) he proposes a correct statement of the law; (2) his theory is supported by the evidence; (3) the theory of defense is not part of the charge; and (4) the failure to include an instruction of the defendant's theory would deny him a fair trial." United States v. Friedman, 658 F.3d 342, 352-53 (3d Cir. 2011) (quoting United States v. Hoffecker, 530 F.3d 137, 176 (3d Cir. 2008)(internal quotation marks omitted)). The District Court "was bound to give the substance of a requested instruction relating to any defense theory for which

---

[24] Finally, the parties dispute whether the omission of an element from the jury instructions constitutes per se plain error. In light of our above finding that the District Court did not commit an error at all, we need not address the issue.

there was any foundation in the evidence." United States v. Blair, 456 F.2d 514, 520 (3d Cir. 1972) (citation omitted). Sussman proposed his own theory of defense instruction, but the District Court delivered a revised version to the jury. Of course, a court does not err merely because it does not give an instruction in exactly the words a defendant submits for "[n]o litigant has a right to a jury instruction of its choice, or precisely in the manner and words of its own preference." Douglas v. Owens, 50 F.3d 1226, 1233 (3d Cir. 1995) (citations omitted). In fact, "[i]t is well settled that there is no error to refuse to instruct as counsel wishes if the charge to the jury is correct." Blair, 456 F.2d at 520 (citations omitted).

On appeal, Sussman argues that the District Court's alternative theory of defense instruction was prejudicial. He requested the following instruction:

> It is the theory of the defense in this case that Mr. Sussman, when he took with him the contents of [the BNY box] on February 7, 2008, was intending to safeguard the coins that were in [the box] from seizure by other creditors. It is asserted that since he did not intend to steal the coins or violate the terms of the final order, he is not guilty of either of the two offenses with which he is charged. Evidence has been presented that the event which motivated his actions was the seizure by the Bergen County Sheriff in late January 2008 of the contents of the safety deposit box at the Bank of America branch in Ft. Lee. In Mr.

49

[S]ussman's view, if he won his appeal, the coins would belong to him. If he lost the appeal, the coins would be available to help satisfy the judgment obtained by the FTC. It is further the theory of the defense that Mr. Sussman retained possession of the coins only until the appellate proceedings had ended without success and then made prompt arrangements through his counsel to return the coins.

Unless the government has proved beyond a reasonable doubt that Mr. Sussman acted with criminal intent, or corruptly interfered with the judicial process, he must be found not guilty.

App. at 122. The District Court's written charge, however, included the following instruction:

It is the theory of the defense in this case that Mr. Sussman, when he took with him the contents of [the BNY box] on February 7, 2008, was intending to safeguard coins that were in [the box] from seizure by other creditors and was not intending to steal, embezzle or knowingly convert the coins, or to violate a court order.

Supplemental app. at 17. Yet the trial transcript included a slightly modified version:

It is the theory of the defense in this case that Mr.

50

Sussman, when he took with him the contents of [the box], was attempting to safeguard coins seized by other creditors and not intended to steal, embezzle or knowingly convert the coins or violate a court order.

App. at 537. Both versions of the charge abbreviated Sussman's requested theory of defense instruction. Sussman takes particular issue with the distinction in the Court's two charges (Sussman's proposed charge related to protection of the coins in the Secaucus box that creditors other than the FTC had not seized) between coins that were not yet seized by creditors and those that already had been seized by creditors.

In regard to the written instruction, "a defendant is not entitled to a judicial narrative of his version of the facts, even though such a narrative is, in one sense of the phrase, a theory of the defense." Hoffecker, 530 F.3d at 176 (internal quotation marks and citations omitted). In Hoffecker we cited approvingly to the Court of Appeals for the Eleventh Circuit's decision in United States v. Paradies, in which it found "that the district court was correct in finding that the requested jury charge was partisan and that it aspired 'to place the . . . defendants' desired factual findings into the mouth of the court." Id. at 177 (citing United States v. Paradies, 98 F.3d 1266, 1287 (11th Cir. 1996)(internal quotation marks omitted)). Here the final sentence in Sussman's proposed theory of defense instruction merely reiterated the intent requirement of the offense, which the District Court already had covered in the "elements" sections of the jury instructions. Nevertheless, in the Court's theory of

51

defense instruction it did make reference to Sussman's intent. Moreover, the Court accepted Sussman's suggestion to add "or to violate a court order" at the end to clarify that the "theory of defense" instruction applied to both counts. App. at 492. The Court, therefore, not only agreed to offer a "theory of defense" instruction but also provided one that encapsulated Sussman's arguments without rehashing the facts established during trial. The Court did not err in taking that approach.

Yet we cannot gloss over the discrepancy between the trial transcript's version of the charge and the written version of the charge. The government asserts that the transcript's version of the instruction does not accurately reflect what the Court said, and, in any event, the jurors had copies of the written instructions during deliberations. Appellee's br. at 48. The government also claims that Sussman's objection was only to the "theory of defense" instruction's length and not its content. Therefore, the government contends that the District Court must have read the written version of the charge to the jury and did not give the transcript's version. Appellee's br. at 49. But Sussman's objection to the "truncat[ed]" charge did not indicate an unqualified acceptance of the instruction's content. Although Sussman's objection on the theory of defense instruction focused on his proposal of "a long one" and the Court's delivery of "a shorter one," he still "object[ed] to the charge as delivered." App at 565. Of course, it would be expected that there would be a correlation between an objection to the length and an objection to the content of an instruction, as the former objection may encompass the latter objection if the reduced length is substantial as it is likely to reflect altered content.

52

The government's argument, moreover, implicitly concedes that there was a legal error in the transcript's version of the instruction because the argument suggests that Sussman clearly would have objected to the instruction's content if the District Court had read the version that the transcript indicates that it did. Furthermore, the government's contention that the transcript is not accurate does not take into account that in the absence of a motion to correct or modify the record under Federal Rule of Appellate Procedure 10(e), we "accept[] as accurate the transcript of the district court proceedings." Gov't of the Virgin Islands v. Paniagua, 922 F.2d 178, 181 n.1 (3d Cir. 1990) (referencing Fed. R. App. P. 10(e), which states, "[i]f any difference arises about whether the record truly discloses what occurred in the district court, the difference must be submitted to and settled by that court and the record conformed accordingly").

In the alternative, the government counters that the transcript's version of Sussman's theory of defense, "while inartful, was hardly erroneous or confusing, and the jury could have referred to its written copy of the instructions for clarification." Appellee's br. at 49. The government supports its argument by citing to our decision in United States v. Ozcelik in which we took into consideration the fact that "the jurors had copies of the instructions that contained the [proper] word[ing]." 527 F.3d at 97. Yet in Ozcelik, we deferred to the district court's explicit determination that it had read the proper instruction to the jury. See id. Here, unlike in Ozcelik, the government never filed a motion to correct the record, and the District Court never addressed the matter. We also recognize

53

that the law "'presumes that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them.'" United States v. Hernandez, 176 F.3d 719, 734 (3d Cir. 1999) (quoting Francis v. Franklin, 471 U.S. 307, 324 n.9, 105 S.Ct. 1965, 1976 n.9 (1985)).

Nonetheless, the problem with the theory of defense charge is not nearly as significant as Sussman claims. In Hernandez, the district court gave the jury conflicting explanations of reasonable doubt. See Hernandez, 176 F.3d at 734. We understandably were concerned that the jury returned its guilty verdict even though the government might not have proved its case beyond a reasonable doubt. See id. Here, if the District Court erred in giving the oral theory of defense instruction, the error was not of the same magnitude as the error in Hernandez. We also stand by "the axiom that jury instructions must be viewed in their entirety." Id. (citing United States v. Isaac, 134 F.3d 199 (3d Cir. 1998); United States v. Pine, 609 F.2d 106 (3d Cir. 1979); United States v. Smith, 468 F.2d 381 (3d Cir. 1972)).

Taken as a whole, the instructions accurately conveyed the direction that the key issue before the jury was Sussman's intent when he removed the coins as there was no doubt that he had done so. Overall, it was perfectly obvious that Sussman's theory of defense was that he was protecting the coins in Secaucus from seizure of creditors other than the FTC. Although the exact status of the coins at the time of removal was

in dispute, the key factual issue was whether they constituted government property – not whether other creditors had already seized them. Under any standard of review, we do not find this slight wording error sufficient reason to overturn the jury's verdict.

## V.  CONCLUSION

For the foregoing reasons, we will affirm the judgment of conviction and sentence entered October 8, 2009.